## JARKA CORPORATION v. HELLENIC LINES, Ltd.

### No. 235, Docket No. 21638.

United States Court of Appeals
Second Circuit.

Argued May 5, 1950.

Decided June 6, 1950.

Paul A. Crouch, of New York City (Clark, Carr & Ellis, of New York City, on the brief), for plaintiff-appellant.

George F. Tinker, of New York City (Burlingham, Veeder, Clark & Hupper and Ray Rood Allen, all of New York City, on the brief), for defendant-appellee.

Before L. HAND, Chief Judge, and CHASE and CLARK, Circuit Judges.

## CLARK, Circuit Judge.

This is an appeal by the plaintiff from so much of a judgment, on exceptions to the report of a special master, as dismissed plaintiff's claim for a balance on stevedoring charges for loading baled hay. The only question is whether defendant should be charged at the rate of $3.93 per weight ton, as defendant claims, or at the rate of $2.65 per measurement ton, as plaintiff claims. The action was originally brought in the state court and was removed by the defendant to the court below because of the diverse citizenship of the parties.

In the stevedoring business neither weight nor measurement alone provides an accurate gauge of the work and expense involved in loading which can be applied to all commodities. A ton of a commodity which is very light in weight and thus occupies a relatively great amount of space will cost more to load than a ton of a commodity which is heavy and compact. For that reason it is customary to set a rate to be applied "per ton of 2240 lbs. or 40 cubic feet as manifested." Generally commodities which run more than 40 cubic feet to the ton will be manifested in measurement tons, i. e., units of 40 cubic feet, while heavier and more compact commodities are manifested per weight ton.

Such an engagement was entered into on November 5, 1947, between the plaintiff, Jarka Corporation, a stevedoring company, and Funch, Edye & Co., agents for the defendant Hellenic Lines, Limited. The written agreement provided that the plaintiff as "Contractor" would handle the loading and unloading of any vessels provided to it at the Jarka pier in Hoboken by defendant. It specified a rate, for outbound cargoes, of $4.26 per manifest ton. Section 19 thereof stated: "This agreement may be terminated, modified or amended upon thirty days' notice by either party, provided, however, that notwithstanding any such termination, the Contractor shall continue to be responsible for the loading and discharging of any cargo which the Contractor is handling on the effective date of such termination."

In May, 1948, defendant arranged a conference with plaintiff's vice-president, Captain Yates, to try to secure a lower rate on cargo carried by defendant under contract for the Army. Defendant wished thereby to better its competitive position. Being of foreign registry, it was required to load Army cargo through a stevedoring concern, while ships of United States registry could go to an Army port where they would be loaded at the Army's expense. Captain Yates agreed to modify the November agreement by providing for Army cargo a rate of $3.93 per ton, rather than the original rate of $4.26. He prepared a letter confirming this agreement in which he spoke of the rate as "$3.93 per manifest ton." Arnesen, vice-president of Funch, Edye & Co., called Captain Yates on the phone and asked him to withdraw that letter, and instead to prepare a letter making mention of the Tariff of the North Atlantic-Mediterranean Freight Conference, of which defendant was a member. After some discussion Captain Yates agreed, and sent defendant's agent on May 5, 1948, a letter saying:

"This letter will confirm the arrangement reached at our discussion yesterday at which time we agreed to amend the Stevedoring Agreement dated November 5, 1947 covering the handling of the vessels of Hellenic Lines Ltd., at Hoboken, to the

918

extent that cargo shipped by the U. S. Army will be billed at the rate of $3.93 per manifest ton according to conference tariff. This amendment will be retroactive to the effective date of the Stevedoring Agreement and the rate is subject to the terms and conditions embodied therein. Kindly indicate your acceptance of this amendment by signing the enclosed duplicate copy of this letter, returning same to us for our files."

Funch, Edye & Co. never returned a signed copy of the letter. On June 23, 1948, a considerable quantity of baled hay came to the pier for loading as Army cargo. Baled hay is classified by the Mediterranean Conference Tariff on a weight basis, and thus would have been billed on that basis in accordance with the letter of May 5. But baled hay runs 185 cubic feet to the ton, and in plaintiff's view could not profitably be handled at a rate of $3.93 per weight ton. On that day, therefore, Captain Yates sent the following letter to Hellenic:

"We refer to the shipment of baled hay to be loaded on the SS 'Hellenic Star' due to dock at Pier # 9, Hoboken, today, and to any subsequent shipments of hay which may materialize. When we loaded a previous shipment of hay, we indicated that this commodity moving commercially is classified on a weight basis for freight revenue purposes under the tariff. We understand, however, that freight revenue on Army shipments is customarily payable on a measurement basis. It is perhaps unnecessary to point out that stevedoring production alone on this bulky commodity which measures over 150 cubic feet to the weight ton, will not permit us to handle this cargo on a weight basis at the terminal rate of $3.93 per ton. At the same time, the application of the same rate on a measurement basis for Army hay would possibly create an inequality to you. We therefore submit for your approval, a terminal rate of $2.65 per ton of 40 cubic feet for all shipments of hay in bales effective with this vessel and including the combined services set forth in our agreement. Upon your endorsement, this letter supplement will be subject to the general terms and conditions of our agreement presently in effect."

There was no reply or express acceptance of this letter. Plaintiff loaded the baled hay both on the "Hellenic Star" and on the "Hellenic Wave," which was in port from July 5 to July 9. The difference between the stevedoring charge on the measurement basis, which plaintiff proposed in its letter of June 23, and the deadweight basis, set out in the letter of May 5, is $5,190.99. The special master held that the letter of May 5 was unsupported by any consideration and was merely an offer terminable at will. Thus he held in plaintiff's favor, saying that defendant should be billed at the rate specified in the agreement of the preceding November. On review the district judge sustained an exception to this determination, and held that the May 5 offer was effective and binding and that defendant should pay only the rate there specified.

■ We agree with the district judge that the document of November 5, 1947, was not a contract. It in no way binds or obligates defendant to do anything. Defendant might well have sent one hundred vessels to the Port of New York, to be loaded and unloaded by plaintiff, and these plaintiff would have been obliged to handle. But defendant could just as well have refrained from sending any ships whatsoever, and plaintiff would have had no claim against it. Since the "agreement" leaves defendant free to dock where it will, it lacks mutuality and is not legally enforceable. Chiapparelli v. Baker, Kellogg & Co., 252 N.Y. 192, 200, 169 N.E. 274, 277; Chicago & Great Eastern Ry. v. Dane, 43 N.Y. 240. Thus the agreement is merely an offer by plaintiff, specifying the terms and conditions which will govern if defendant chooses to furnish any ships to be serviced by plaintiff.

■ But N.Y. Personal Property Law, McK.Consol.Laws, c. 41, § 33(5) provides: "When hereafter an offer to enter into a contract is made in a writing signed by the offeror, or by his agent, which states that the offer is irrevocable during a period set forth or until a time fixed, the offer shall

not be revocable during such period or until such time because of the absence of consideration for the assurance of irrevocability." This section, which was added to the statute in 1941, is "the recognition of an already existing and growing custom" of businessmen to make so-called "firm" offers, which are assumed to be binding against the offeror even though he receive no consideration. Corbin, The Uniform Commercial Code—Sales; Should It Be Enacted? 59 Yale L.J. 821, 827-8. Section 19 of plaintiff's offer of November, 1947, quoted above, seems to us to bring that offer within the provisions of the statute just mentioned. While the section did not use the word "irrevocable," its clear intent was to keep the offer open for a stated time, until thirty days after notice of termination. If New Lork law is applicable to this transaction, the offer of November, 1947, is binding even though it was without consideration. ,

■ In deciding whether or not New York law is applicable we enter the twilight zone of the interrelationship between state law and maritime law. A contract for stevedoring is a "maritime" contract. Atlantic Transport Co. of W. Va. v. Imbrovek, 234 U.S. 52, 61, 34 S.Ct. 733, 58 L.Ed. 1208, 51 L.R.A.,N.S., 1157; Robinson on Admiralty § 20, 1939. In the famous case of Southern Pac. Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A. 1918C, 451, Ann.Cas.1917E, 900, and its progeny, the Supreme Court, over strong dissent, called attention to the necessity of uniformity in certain aspects of maritime law, and invalidated several state workmen's compensation acts which were said to interfere with that essential uniformity. In United States Nav. Co. v. Black Diamond Lines, 2 Cir., 124 F.2d 508, certiorari denied Black Diamond Lines v. U. S. Nav. Co., 315 U.S. 816, 62 S.Ct. 805, 86 L.Ed. 1214, we left open the effect which the Jensen rule might have on the applicability of § 33 of the N. Y. Personal Property Law to maritime contracts, though Judge L. Hand, dissenting, was already prepared to hold it applicable. But subsequent Supreme Court opinions made it clear that the present Court would apply the Jensen rule— and overlook state law—only with great reluctance. See Parker v. Motor Boat Sales, 314 U.S. 244, 247, 248, 62 S.Ct. 221, 86 L.Ed. 184; Davis v. Department of Labor and Industries of Washington, 317 U.S. 249, 252-256, 63 S.Ct. 225, 87 L.Ed. 246. Finally, in Standard Dredging Corp. v. Murphy, 319 U.S. 306, 309, 63 S.Ct. 1067, 1068, 87 L.Ed. 1416, Justice Black, speaking for a unanimous Court, said: "Indeed, the Jensen case has already been severely limited, and has no vitality beyond that which may continue as to state workmen's compensation laws." This is only a dictum, to be sure, but it is a dictum strongly stated, and already accepted as authoritative by this court in Guerrini v. United States, 2 Cir., 167 F.2d 352, 355, certiorari denied 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393. We think that even in its greatest ascendancy the Jensen rule would not have prevented application of such a state statute as this, which regulates a matter in which uniformity is not necessary and which is not "in conflict with any essential feature of the general maritime law." Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 125, 44 S.Ct. 274, 277, 68 L.Ed. 582. In view of the latest Supreme Court pronouncements, we should certainly not extend the Jensen rule at this late date to a field in which it has not hitherto been applied. Thus we hold that the N. Y. Personal Property Law § 33(5) is applicable here and hence that the offer of November, 1947, even though without consideration, bound plaintiff until thirty days after it had given notice of termination.

■ The letter of May 5 from Captain Yates modified the earlier offer and included by explicit reference its terms, among them the provision making the offer irrevocable until thirty days after notice of termination. This modification is also made binding by §§ 33(2) and 33(5) of the N. Y. Personal Property Law. No notice of termination was given until June 23, when Captain Yates informed defendant that the May 5 modification could not be feasibly applied to shipments of baled hay. But this notice of termination could not alter defendant's rights and powers until thirty days after it was sent, and both of the load-

ings here in question occurred well before expiration of that period. Defendant of course could have waived its rights and agreed to the new rate set out in the June 23 letter. But that letter specifically provided that acceptance of it should be indicated by endorsement, and this defendant never did. Defendant did furnish two ships to be loaded, but this was an acceptance of plaintiff's earlier binding offer of November, 1947, as modified by the letter of May 5.

Plaintiff, in its brief and argument before us, puts much stress on another contention apparently not brought to the attention of the district judge until after his original opinion dismissing this claim. This is that the testimony given before the Master, both by Captain Yates and by V. H. Arnesen, Funch, Edye & Co.'s vice-president, shows that the parties never intended that the May 5 rate should apply to baled hay. Such an argument must of course first surmount the hurdle of the parol evidence rule, 9 Wigmore on Evidence § 2425, 3d Ed. 1940; plaintiff claims that under applicable state law it is error not to give effect to antecedent conversations as evidence of the parties' intentions where the testimony of the conversation has not been objected to, but rather has been confirmed by the other party's testimony. This contention is based on Brady v. Nally, 151 N.Y. 258, 45 N.E. 547, and Higgs. v. DeMaziroff, 263 N.Y. 473, 189 N.E. 555, 92 A.L.R. 807. We find it unnecessary to consider its correctness or its applicability, since careful examination of the parol evidence sought to be given effect here discloses nothing which is contrary to the conclusions we have reached on the basis of the written documents alone.

The testimony involved was, briefly, that when Arnesen, vice-president of defendant's general agent, telephoned to ask Yates to withdraw his first letter setting a new rate for Army cargo, and to substitute a letter making mention of the Mediterranean Conference Tariff, Yates demurred. He told Arnesen that he would have to take exception to baled hay, since he understood that the Conference Tariff classified that by weight, and that it was impossible to load it on a weight basis. Plaintiff had had shipments of hay before and, in Yates' words, "felt that we needed protection against such an inclusion." If Arnesen had then said explicitly that no hay would be shipped, it might well be considered excluded from the contract. But this is not what Arnesen said. According to Yates: "He stated to me that not to worry about hay in bales because it had moved only once and then commercially. It would not be Army cargo." On the termination of this telephone conversation Yates agreed to revise his letter to make mention of the Conference Tariff. Arnesen's own testimony was that he did not say that hay would not be carried, that "any impression or expression that I might have made at that time was predicated entirely on what the market was presenting," and that no person, "not even a mystic," could predict what cargoes would be carried at any future time.

■ Notwithstanding the somewhat self-serving nature of Arnesen's testimony, we think it not unfair as an interpretation of Captain Yates' own version. Arneson's statement was not an assurance that no hay would be shipped by the Army—he was surely in no position to make such an assurance. It was rather his honest forecast of what he expected to be shipped. Captain Yates was just as well able to forecast what the Army would be shipping as was Arnesen. Captain Yates had already agreed to a special rate for Army cargo because he expected it to consist of jeeps and trucks, cargoes which are normally profitable to stevedores. In his own words, he accepted the suggestion in May for about "a 12 per cent decrease" in rates "in a spirit of co-operation, and with a little gamble to it also, I felt, because we had not seen these Army cargoes as yet." Just as he then gambled that the cargoes would be of a sort which would be profitable to his company, so also he gambled— a few days later if not then—that there would be no hay tendered for loading. It may be that he was improperly talked out of his tentative objection too easily, but that is the essence of negotiation. As we pointed out in Rode & Brand v. Kamm

Games, Inc., 2 Cir., 181 F.2d 584, it is not the function of courts to protect businessmen from their losing gambles or to deny to an apt, or more probably, fortunate negotiator the fruit of his success.

Judgment affirmed.