**Otto NATHAN and Helen Dukas, as Trustees under the Last Will and Testament of Albert Einstein, deceased, Plaintiffs,**

v.

**MONTHLY REVIEW PRESS, INC., Leo Huberman and Paul M. Sweezy, Defendants.**

No. 68 Civ. 3719.

United States District Court,
S. D. New York.
Dec. 24, 1969.

Botein, Hays, Sklar & Herzberg, New York City, for plaintiffs; Harry I. Rand, New York City, of counsel.

London, Buttenwieser & Chalif, New York City, for defendants; Aaron M. Cantor, New York City, of counsel.

## OPINION

LASKER, District Judge.

This case involves a dispute as to the ownership of the literary property in an essay written in 1949 by the late Dr. Albert Einstein entitled "Why Socialism?". Each party, though acknowledging some rights of the other in the property, claims to be the owner, and each moves for summary judgment. As one would expect when confronted with opposing motions for summary judgment, there is a substantial degree of agreement as to the material facts. Unfortunately, however, there is also significant disagreement as to matters which cannot be adjudicated from the papers before the court, carefully drawn, lucid and detailed as they are, and consequently both motions must be denied. We review below the facts of the case, divided for treatment between those agreed and those disagreed, with observations as to the significance of the disagreement and the reasons why the matters still in dispute prevent the granting of summary judgment.

It is uncontested that in late 1948 and 1949 plaintiff Nathan, together with defendants Huberman and Sweezy, made plans to publish a new socialist periodical to be called "Monthly Review." The lead article of the first issue was Dr. Einstein's essay "Why Socialism?", the subject of this litigation. Huberman and Sweezy were identified on the contents page of the first issue as the editors and publishers of *Monthly Review*.[1]

On May 16, 1949, the copyright in the essay was registered by *Monthly Review* with the United States Copyright Office and a certificate of registration was issued.[2] Dr. Einstein was not paid for writing the essay, nor did Dr. Einstein

and *Monthly Review* enter into any written agreement or exchange any documents relating to the copyright or specifying who owned the literary property in the essay. Dr. Einstein died in April 1955, and Nathan was appointed his executor.[3]

In 1951 Monthly Review, Inc. acquired sole ownership of the assets of *Monthly Review*. In 1966 Monthly Review Press, Inc. was organized. It is wholly owned by Monthly Review, Inc. Huberman and Sweezy were the stockholders and directors of Monthly Review, Inc., and its officers. They were also the editors of Monthly Review Press, Inc. At various times, including February 1951, May 1958, and November 1960, *Monthly Review* issued pamphlet versions of "Why Socialism?" The essay also appeared in the June 1955 issue of *Monthly Review*.[4]

After his appointment as Dr. Einstein's executor, Nathan, on July 18, 1956, wrote to *Monthly Review* advising it that the Einstein estate was preparing a publication of Dr. Einstein's collected works, and stating:

"In order to secure formal clearance of this material I should appreciate receiving your consent for the inclusion of:

A. Einstein: Why Socialism, in *Monthly Review, An Independent Socialist Magazine*, Vol. 1, issue for May (No. 1), p. 9–15."

(Defendant's Exhibit 1.)

This letter provided a space in which *Monthly Review* could grant the requested consent. Huberman did so by signing the letter on July 24, 1956, and returning it to Nathan.

On May 24, 1957, Nathan again wrote to the editors of *Monthly Review*[5]

"* * * to ask that you formally assign the copyright for 'Why Socialism?' To avoid misunderstandings I

1. Plaintiff's Exhibit A(1).

2. Plaintiff's Exhibit B.

3. Plaintiff's Exhibit C.

4. Plaintiff's Exhibits D and E.

5. Plaintiff's Exhibit F.

should like to mention that the request addressed to you last July involved permission only for the publication of the collected works of Albert Einstein."

Nathan's letter stated that the estate sought the assignment "to avoid frequent inquiries" and that the estate had been advised by its counsel that

"when Albert Einstein granted publishers permission to produce one of his works in a given magazine or publication the literary property of that work remained in other respects with Einstein himself."

In reply to Nathan's letter of May 24, Huberman wrote on May 28, 1957,[6] stating:

"We have no objection to assigning the copyright for 'Why Socialism?' * * * provided that such assignment does not relinquish our right to republish the article in full or in part whenever we have occasion to do so."

On June 8, 1957, Nathan, in response to Huberman's last letter, addressed the editors of *Monthly Review*:[7]

"Magazines and publishers ordinarily assign, upon request, to authors, who made material available for a specific publication without remuneration, the copyright for their work, almost automatically and without attaching any conditions. However, since I am anxious to avoid any controversy with the editors of MONTHLY REVIEW, even in my capacity as Einstein's executor and trustee, it will be understood that in assigning the copyright for 'Why Socialism?' to the Estate of Albert Einstein, MONTHLY REVIEW retains the right 'to republish the article in full or in part whenever it has occasion to do so,' which, I assume, is meant to include the use of certain passages of the article for advertising purposes."

Not having heard from the *Monthly Review* editors by July 6, 1957, Nathan on that day wrote to them requesting a reply to his letter of June 8th. Accordingly, on July 11th, Huberman, on the letterhead of *Monthly Review*, wrote to Nathan as follows:[8]

"Our failure to reply to your letter of June 8 was not due to any lack of courtesy. We saw no necessity for a reply since your letter of June 8 was merely an acceptance of the provision stated in our letter of May 28.

"However, if a formal reply is required, this letter may serve. We hereby acknowledge receipt of your letter of June 8, 1957, and note that it affirms the content of our letter of May 28, 1957."

On July 13th, Nathan continued the correspondence by addressing a letter to *Monthly Review*[9] stating:

"I need a formal letter assigning the copyright of 'WHY SOCIALISM' to the Estate of Albert Einstein, which I shall submit to the Copyright Office of the United States to be recorded in the Copyright Office Records of Assignments and Related Documents.

"This formal letter should contain no reference to the provision made in your letter of May 28, 1957 and confirmed by my communication of June 8, 1957."

On July 17, 1957, Huberman, again on the letterhead of *Monthly Review*, wrote to Nathan:[10]

"We hereby assign the copyright for the article 'Why Socialism?' which appeared in Vol. I. No. 1 of *Monthly Review*, to the Estate of Albert Einstein."

Thereafter, on June 20, 1957, the Einstein estate forwarded the assignment of copyright to the Copyright Office and later received a certificate that the assignment was recorded July 22, 1957.[11]

6. Plaintiff's Exhibit G.

7. Plaintiff's Exhibit H.

8. Plaintiff's Exhibit I.

9. Plaintiff's Exhibit J.

10. Plaintiff's Exhibit K.

11. Plaintiff's Exhibit M.

On October 8, 1958, Nathan, as executor, assigned the estate's rights in Dr. Einstein's literary property to himself and Helen Dukas, as Trustees under Dr. Einstein's Will.[12]

Finally, in June, 1968, defendants published the essay in a book entitled *Introduction to Socialism* by Leo Huberman and Paul Sweezy.[13] On the title page, next to the designation of Huberman and Sweezy as authors, there appears: "With an essay by Albert Einstein." The reference to Einstein is in the same type as the reference to Huberman and Sweezy.

On the basis of this history, the plaintiffs contend that they own the copyright in the essay as a result of the 1957 assignment to the estate, and that the defendants' publication and sale of *Introduction to Socialism* infringes on their copyright, since the essay is included therein without their permission. They seek to enjoin the book's publication and distribution, to have copies of it delivered up for impounding, and to recover damages, costs, and fees.

On the other hand, the defendants assert that they retained the right to include the essay in the book, as a result of the republishing authority which Nathan recognized in them in his letter of June 8, 1957, preceding the formal assignment on which plaintiffs rely. Defendants also maintain that plaintiffs obtained the assignment by fraud, and are thereby estopped from invoking any rights under it. They seek to dismiss the complaint, to receive a declaratory judgment that plaintiffs do not own the copyright in "Why Socialism?", and to recover costs and fees.

The following catalog of items remaining in dispute explains the differing conclusions of the parties as to the meaning of the documents exchanged between them.

The parties disagree vigorously as to what is the legal effect of Dr. Einstein's original transmittal of the article to the *Monthly Review* for publication. Plaintiffs argue (fortifying the argument by the fact that plaintiff Nathan was associated with the magazine at the time and was an intimate of Dr. Einstein's) that Dr. Einstein wrote the essay as a favor to Nathan and that he at no time intended to part with ownership thereof. The plaintiffs regard the defendants' copyright registration of the article as a mechanical act which, in effect, put the defendants in a position of trusteeship for the benefit of Dr. Einstein and the Einstein estate. They refer (as indicated in Nathan's letters of May 24, 1957 and June 8, 1957 mentioned above) to the custom in the literary profession of a publisher copyrighting its authors' works as a matter of convenience, but with the understanding that the equitable title to the property remains in the authors.

The defendants strongly dispute this interpretation of the situation. Their position is that Dr. Einstein did indeed make a generous gesture to the *Monthly Review*, that his generosity was unsullied, and that the article was given to the *Monthly Review* unconditionally. It is their view that they owned the article, lock, stock and barrel, until such time as they voluntarily acquiesced in Nathan's request that they assign the copyright to the estate of Dr. Einstein.

From this clear difference in concept as to the legal effect of the original transaction between Dr. Einstein and the defendants flow a number of other important differences as to the significance of the various transactions which have taken place between Dr. Einstein's estate and the defendants since Dr. Einstein's death. In view of their dispute as to whether Dr. Einstein donated the article unconditionally to the *Monthly Review* or, in fact, retained ownership of it, it is not surprising that the parties clearly view their acts of the last years quite differently. For example, plaintiffs, regarding Dr. Einstein as the constant owner of the property, take the

12. Plaintiff's Exhibit N.

13. Plaintiff's Exhibit O.

position that the assignment of copyright executed by defendants to the estate constituted nothing more than a recognition of what had always been the equitable position and a mechanical device necessary for formal registration. Looking upon themselves as the owners, and representatives of the man who always did own title to the article, they regard their 1957 grant to the defendants of the right to republish as a restricted right, the limits of which are to be carefully construed. The gist of the plaintiffs' position is that the right granted to defendants to "republish" the article consisted of reprinting the material in the same forms in which it had been issued or for advertising purposes (as mentioned in Nathan's letter to defendants of June 8, 1957), but not in any other form, and particularly not in its present form as the leading article of a book. Nathan declares that at no time

> "did I understand that the right I was thus granting to "Monthly Review" was any broader than the right to use the Essay in the magazine, to issue pamphlet reprints of it, and to use excerpts from it in advertising." [14]

Defendants, on the other hand, having regarded themselves always as the true owners of the essay, who generously assigned technical copyright to the estate, maintain that the proper interpretation of the republishing rights which they reserved should not be, and is not, a niggardly one; that they retain the right to republish not only in the previous forms, but in all forms of publication, including in a separate book.

Not surprisingly, defendants, in support of their position, point to the language in the clause concerning their republication rights, language which is broad and unrestricted ("MONTHLY REVIEW retains the right 'to republish the article in full or in part whenever it has occasion to do so * * *'"). They also deny that Dr. Nathan ever suggested in any way that there were any limitations on the republishing rights. To bolster their contention that those rights include publication in book form, they interpret Nathan's July 18, 1956 letter requesting consent for the inclusion of the essay in a publication of Einstein's collected writings as a tacit admission that defendants continuously possessed the right to publish it in book form. (Plaintiffs deny this and claim that what this letter contemplated and what was ultimately manufactured was not a book, but microfilm materials.) The defendants also interpret Nathan's July 13, 1957 letter requesting that the assignment of copyright contain no reference to their republishing rights as an effort by Nathan to conceal from the Copyright Office defendants' retention of ownership rights in the essay, which, if they existed, would be inconsistent with the estate's copyright claims.

The essential dispute between the parties here, of course, is over the meaning and scope of defendants' right to "republish". While it is elementary that under ordinary circumstances the meaning of a written contract is to be drawn from the writing itself, parol evidence is nevertheless admissible where required to clarify an ambiguous agreement, particularly where the ambiguity relates, as it does here, to the intentions, at various times, of the parties. As then District Judge Feinberg observed in United Electrical, Radio & M. Wkrs. v. General Electric Co., 208 F.Supp. 870, 872 (S.D.N.Y.1962):

> "The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation." (Citations omitted.)

Such is the case here. Although the parties agree as to most of the factual events which preceded and followed the crucial June 8, 1957 letter containing the "republishing rights" clause, they heatedly contest the meaning of those events and of the documents exchanged

---

14. First Nathan Affidavit, par. 15.

pursuant to them. This dispute not only permits, indeed requires, the court to consider extrinsic evidence, but also precludes the grant of summary judgment for either side.

> "Since both are possible interpretations, we think there was a factual question as to the parties' intent which could not be resolved on a motion for summary judgment." Lemelson v. Ideal Toy Corporation, 408 F.2d 860, 863 (2d Cir. 1969) (Smith, J.). (Citations omitted.)

Summary judgment is inappropriate "when the inferences which the parties seek to have drawn deal with questions of motive, intent, and subjective feelings and reactions." Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2d Cir. 1962) (Kaufman, J.).

■ Furthermore, as the foregoing indicates, the parties' dispute is not simply confined to the meaning of "republish"; they also strenuously challenge each other's ownership rights in the essay. Defendants now claim that their retention of the right to republish preceded the assignment and preserved such broad rights in them as to defeat plaintiffs' proprietorship claims. They rely on the "doctrine of invisibility," which declares, in essence, that "the bundle of rights which accrue to a copyright owner are * * * incapable of assignment in parts. * * * A transfer of anything less than * * * [the totality of rights] is said to be a license rather than an assignment." Nimmer on Copyright, § 119, pp. 510–511. This doctrine, which Nimmer and others criticize (see *Id.*, p. 512) is most relevant to the question of standing to sue. The proprietor of a copyright, of course, has such standing; so does the assignee. But a licensee does not have standing, except for an exclusive licensee who takes advantage of certain procedural machinery enabling him to compel joinder of the proprietor. (See Nimmer on Copyright, § 119.31, pp. 515–516; First Financial Marketing Services Group, Inc. v. Field Promotions, Inc., 286 F. Supp. 295, 298–299 (S.D.N.Y.1968).) Defendants' argument here is that the formal assignment of copyright in fact conveyed no ownership rights in the essay because of their retained republishing rights, and hence deprives the plaintiffs of standing to sue for infringement. Plaintiffs interpret the situation quite differently. As seen above, they view themselves as the owners all along, and claim that *Monthly Review*, far from being the proprietor at the time of the formal assignment, was merely a licensee.[15]

■■ Rule 56 provides that summary judgment may be granted where "there is no genuine issue as to any material fact." The analysis set forth above establishes that in this case there are genuine issues of fact. Accordingly, on the present state of the record it is impossible to determine as a matter of law what the legal rights of the parties are. Where, as here, the documents are ambiguous, a genuine issue exists as to a material fact within the meaning of Rule 56 and forbids the granting of summary judgment. United Electrical, Radio & M. Wkrs. v. General Electric Co., supra; United States v. Manufacturers Casualty Ins. Co., 158 F.Supp. 319 (S.D.N.Y.1957); Boro Hall Corp. v. General Motors Corp., 164 F.2d 770 (2d Cir. 1957); Drake v. Handman, 30 F.R. D. 394 (S.D.N.Y.1962).

A final item requires disposition. Plaintiffs' motion requests, "[i]f summary judgment is not rendered in plain-

15. There are corollary factual disputes concerning the relationship between Monthly Review, Monthly Review, Inc., and Monthly Review Press, Inc. These three different legal entities appear to be comprised of essentially the same personnel, engaged in essentially the same enterprise, viz., the publication and distribution of socialist literature. Their relationship is relevant only if plaintiffs are right that Monthly Review—in whom the republishing right was conferred —was a licensee, in which case it could not have sublicensed its rights in the essay to the present defendant Monthly Review Press, Inc.

tiffs' favor upon the whole case or for all the relief asked and a trial is necessary, that the Court * * * make an order specifying the facts that appear without substantial controversy * * * " I regret that my analysis of the case, as set forth at some length above, convinces me that it would be impractical to frame an order specifying the "facts that appear without substantial controversy." My review does, of course, outline the areas which appear to be agreed, and this framework may serve as a guide to the parties in future proceedings.

For the reasons set forth in this opinion, the motions of both parties for summary judgment are denied.