**AMERICAN CYANAMID COMPANY,**
Plaintiff,

v.

**ELIZABETH ARDEN SALES CORPO-
RATION et al., Defendants.**

No. 70 Civ. 4598.

United States District Court,
S. D. New York.

Sept. 13, 1971.

Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff; by Joseph H. Flom, Michael W. Mitchell, Stuart L. Shapiro, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Elizabeth Arden Sales Corporation, and The Bank of New York, J. Howard Carter and Patricia Graham Young, individually and as Executors of the Estate of Elizabeth Arden, deceased by Edward W. Keane, New York City, of counsel.

Dewey, Baliantine, Bushby, Palmer & Wood, New York City, for defendant Eli Lilly and Company; by Everett I. Willis, John W. Galiardo, New York City, of counsel.

## OPINION

GURFEIN, District Judge.

This is a motion by the defendants for judgment on the pleadings under Rule 12(c) F.R.Civ.P. and, alternatively, a motion for summary judgment under Rule 56 in that the complaint fails to state a cause of action and there is no triable issue of fact. In the complaint American Cyanamid Company (Cyanamid) charges with breach of contract and unjust enrichment the defendant Elizabeth Arden Sales Corporation (Arden), the Executors of the Estate of Elizabeth Arden, deceased, namely, The Bank of New York, J. Howard Carter and Patricia Graham Young, individually and as Executors of the Estate. The complaint also charges the defendant Eli Lilly and Company (Lilly) with inducing a breach of the alleged contract between Cyanamid and Arden and of unjust enrichment flowing therefrom.

Extensive discovery proceedings have been commenced by both sides. Plaintiff has thus far examined seven of defendants' witnesses and has expressed an intention to examine additional parties and numerous witnesses. The defendants have partially deposed two of plaintiff's employees and have requested an examination of nine additional witnesses. The testimony taken to date encompasses some 2,000 pages of transcript. The material facts on which the complaint is based, accepting the plaintiff's version for purposes of these motions, arose in the following way.

Elizabeth Arden was the founder and sole owner of Arden, an internationally known manufacturer of cosmetics and fragrances. She died on October 18, 1966. Defendants The Bank of New York, J. Howard Carter and Patricia Graham Young are the Executors of her Estate which owned 100% of Arden.

When the President of the plaintiff met to discuss the possible purchase of Arden with officials of the Bank he told them that Cyanamid would not negotiate to buy Arden if an "auction sale" were contemplated or if Cyanamid's terms would be used to get a higher price from another buyer. These conditions were repeated to Arden's investment advisers and apparently were the subject of general agreement. On the basis of this

understanding Cyanamid undertook a costly and in-depth investigation of Arden's business, including its subsidiaries abroad. The plaintiff finally agreed to meet the defendants' asking price of 35 million dollars in cash. Negotiations continued with respect to various matters, such as the method of verifying Arden's net worth, for adjusting the purchase price in relation to that verification process, as well as provision for an escrow fund and indemnification by the seller. The negotiations culminated in an October 1, 1970 meeting. At the October 1 meeting there were present Bliss and Carter, Forbath, Harvey B. Gross, plaintiff's Secretary and General Counsel, and J. Clifford Blauvelt, plaintiff's Controller.[1] A draft letter agreement containing substantially the same terms as the October 2 agreement about to be described was handed to Bliss and Carter who stated that they did not wish to accept more than a $500,000 (rather than $1.2 million asked for by the plaintiff) reduction on the $35,000,000 purchase price based on the discrepancies that might be determined in the net worth verification. Forbath and Gross stated they would recommend the formal acceptance of these changes by the plaintiff's Executive Committee the next day. Forbath also stated that as soon as the agreement was signed a special meeting of the board of directors of Cyanamid would be called for the next week. Carter and Weinberg, the investment adviser to the Executors, have admitted that all the selling defendants knew of the proposed board meeting when they signed the agreement. The parties agreed that following Executive Committee approval the written agreement would be hand delivered to Bliss who said he would call a meeting of the Executors on October 2 to approve and sign the agreement. As the meeting ended Carter put his arm around Forbath and said "you've got a great deal; you'll see that in two years." On the morning of October 2 Bliss dictated by telephone to Forbath's secretary certain additional language to be placed at the top of page 3 of the draft agreement. This language was substantially incorporated and the agreement was submitted to Cyanamid's Executive Committee which approved it. Forbath then signed the agreement and had it hand delivered to the Executors in New York. Bliss called Forbath and Gross in the afternoon of October 2 and told them that the Executors were ready to accept the written agreement, but he wanted certain clarifying language interlineated on page 1 of the agreement. Forbath and Gross then suggested additional modifications which were incorporated by interlineation on page 3. These modifications were accepted by the Executors.

The written agreement already executed by Forbath on behalf of Cyanamid after formal approval by his Executive Committee was approved and executed on Friday, October 2, by Bliss on behalf of Arden, and by the Executors, Arden's sole shareholders. All signed under the statement "Agreed to and Accepted." The interlineations were also initialled by each Executor and subsequently by Forbath. On learning that the October 2 written agreement would be executed Bliss agreed with Forbath that "we're in business," and agreed to do "everything possible" to move speedily towards a closing. Carter simultaneously offered Gross his congratulations and stated "you've got a great deal; tell your difficult friend [Forbath] in two years he'll see what an excellent deal this has been." The same day, October 2, Bliss sent the executed original agreement to the plaintiff with a personal note which said "I will do everything I can to speed the finalization of the agreement." On Monday, October 5, Forbath received the executed agreement by mail and Cyanamid sent out notices for a special meeting of its directors to be held Wednesday, October 7. On October 5

---

1. Charles M. Bliss is a Trustee of the defendant Bank and was also President and chief executive officer of Arden from July 1970. Forbath is President of Cyanamid.

Blauvelt also contacted plaintiff's accountants, Peat Marwick Mitchell & Co., to arrange for the verification of Arden's net worth pursuant to the agreement. The same day Forbath also tried to reach Bliss to arrange for the plaintiff's auditors to begin the verification but was unable to reach him. When he finally spoke to Bliss that evening Bliss informed Forbath that the Executors had been meeting all day with another party concerning Arden. Forbath expressed shock since they had already agreed to sell Arden to the plaintiff. Forbath stated that the matter would be referred to Cyanamid's Legal Department.

Shortly after the October 2 agreement was signed Lilly sought to commence negotiations with the selling defendants for the properties covered by the agreement. The selling defendants initially refused to negotiate with Lilly on the ground that a "deal" had already been made. Lilly applied some pressure to get a meeting and offered a price which was several million dollars higher than the 35 million dollars Cyanamid was paying. The selling defendants then consulted counsel for advice as to whether they could make a new deal with Lilly. Bliss admitted to Miller, who was involved in the transaction on Cyanamid's behalf, on October 6, that although he had acted in good faith when he signed the agreement on October 2 and believed it constituted a deal, another buyer had pressed him thereafter to negotiate. Bliss stated that he had repeatedly told the buyer that he would not negotiate because he had already made an agreement to sell Arden. Bliss conceded to Miller that it was only after seeking the advice of counsel that he had decided Arden was free to deal with the other party. Even then he recognized that the Executors would be bound unless they could get a cash payment before Wednesday, October 7, when, it was mutually understood, plaintiff's board of directors was to meet formally to approve the acquisition of Arden. The next day, October 7, plaintiff received a telegram from Bliss advising it of the sale of Arden to Lilly. The same day at a special meeting of the plaintiff's board the October 2 written agreement was actually ratified and the acquisition of Arden approved. At the same meeting the Cyanamid board also authorized legal action to be taken against the selling defendants who through Bliss had given notice that they had sold to another.

## THE OCTOBER 2 WRITTEN "AGREEMENT"

The October 2, 1970 written agreement is a closely typed four page letter signed by "American Cyanamid Company by T. P. Forbath, Vice President," and "Agreed to and Accepted by Elizabeth Arden Sales Corporation (by Bliss as President), and by The Bank of New York, J. Howard Carter and Patricia Graham Young [each] as Executor under the Will of Elizabeth Arden." It states substantially the following: It confirms the general understanding with respect to the acquisition by Cyanamid of the assets and business of Arden as a going concern and the assumption by Cyanamid of its liabilities for a price of $35,000,000 (reduced by any dividend between June 30 and the date of closing), the price to be based on the consolidated balance sheet of Arden as of June 30, 1970, and the assumption of liabilities to the extent reflected in such balance sheet, plus liabilities incurred in the ordinary course of business to the date of closing.

It states that the acquisition will be subject to the creation of an escrow fund in the amount of $1.2 million withheld from the purchase price, plus an indemnification of $2.3 million by the Executors. The escrow shall terminate 3 years from the date of closing, and shall be reduced to the extent of 25% per year less, in each year, by the amount of claims in such year. The indemnification shall terminate four years from the date of closing and shall similarly be reduced to the extent of 25% per year less, in each year, by the amount of claims in such year. Claims shall first

be made against the escrow fund until it is exhausted and only then against the indemnification. It states that the purchase price was based on a consolidated net worth of Arden as of June 30, 1970 of approximately $22,000,000. It provides that accountants of Cyanamid would "verify" such net worth "to the extent determined by Cyanamid" during a period of not more than 60 days following the execution of an appropriate purchase agreement. The price was to be reduced if the verification showed the actual net worth to be less than the book net worth.[2] It is further provided that there would be no reduction in the escrow fund for undisclosed liabilities, breaches of representation or warranty or material omissions under the purchase agreement until the aggregate of all claims against the escrow fund equalled at least $50,000.

Cyanamid agreed, that following the closing under the purchase agreement, it would assume and be liable for disclosed liabilities to the extent reflected by the consolidated balance sheet as of June 30 plus liabilities incurred in the ordinary course of business through the closing, as well as undisclosed liabilities of subsidiaries, provided that such undisclosed liabilities would effect a reduction of the purchase price (and of the escrow fund and indemnification as the case may be). It then contains a paragraph which is quoted in full in the margin.[3]

## THE MOTIONS BY ARDEN AND THE EXECUTORS

Arden and the Executor-defendants contend that the October 2, 1970 agreement was not a binding agreement for the following reasons: (a) it was not a meeting of the minds since it did not

---

2. The text of these paragraphs read as follows:

"Any such verification which shows an increase in such net worth from that shown on the books of Elizabeth Arden will not result in any increase in the purchase price. In the event that the accountants for Cyanamid determine that such net worth is $100,000 or less below that shown on the books of Elizabeth Arden, such variance shall be split in half and the purchase price and escrow fund reduced accordingly. In the event that the verification by the accountants for Cyanamid determines that such net worth is more than $100,000 below that shown on the books of Elizabeth Arden, the Executors, at their expense, shall be entitled to engage their accounts to verify such net worth. If both verifications show a decrease in such net worth and the difference between them is $100,000 or less, such net worth shall be reduced by one half of the difference and such amount shall constitute the determined net worth; whereas if such difference between them is more than $100,000, a third nationally recognized public accounting firm will be engaged (at the joint expense of Cyanamid and the Executors) to make a final and binding determination.

"In the event that the final determination of such net worth as provided above is less than $500,000 below that indicated on the books of Elizabeth Arden as of June 30, there will be a corresponding

reduction in the purchase price and the escrow fund but in such event, neither Cyanamid nor Elizabeth Arden may elect to determine their respective obligations under the purchase agreement. If such final determination is more than $500,000 below that indicated on such books, either Cyanamid or Elizabeth Arden may elect to withdraw from its obligations under the purchase agreement; provided that Cyanamid shall have the right to enforce the purchase agreement if it limits the reduction of the purchase price and escrow fund to $500,000. It is the intention of this formula to protect Cyanamid against an overstatement of such net worth. The June 30, 1970 balance sheet is referred to since it is the latest available. However, any gains and losses in assets and liabilities (exclusive of any liability for any dividend declared or paid after June 30, 1970) realized subsequent to June 30, 1970 will be recognized in determining what, if any, reduction in the purchase price and escrow fund may be necessary."

3. "The consummation of such acquisition is conditioned upon the execution of a mutually satisfactory purchase agreement and, on the part of Cyanamid, the approval of its board of directors. It is understood that if, either Cyanamid or Elizabeth Arden is unable to reach such agreement or to obtain such approval, neither party shall have any obligation to the other."

contain all the essential terms required in such a transaction; (b) for the same reason it was invalid under the New York statute of frauds; and (c) the provision for a subsequent formal purchase agreement established that the October 2 "agreement" was nothing more than a *memorandum of understanding.* They contend that Forbath, Vice President of Cyanamid, had no authority to enter into the agreement even though it was authorized by the Executive Committee because, under the by-laws of Cyanamid and guidelines established by its board of directors, an acquisition for more than $2,500,000 requires the approval of the board of directors. Arden and the Executor-defendants argue that since Cyanamid was not bound until its board met there was no mutuality of obligation and that, therefore, the defendants could not be bound.

The plaintiff contends that the agreement of October 2 did contain all the essential terms; that it constituted a meeting of the minds; that the contemporaneous admissions of the defendants' representatives, Bliss and Carter, establish that they too understood that there had been a meeting of the minds. It argues, alternatively, that even if the October 2 agreement was not a binding contract, it was an offer by Arden which under the circumstances was to be irrevocable until the board of Cyanamid had a chance in good faith to ratify it. It also contends that since there was a meeting of the minds the provisions for a subsequent formal written purchase agreement does not destroy the binding effect of the October 2 agreement.

■ Since Cyanamid was incorporated under the laws of Maine, with its principal office in New Jersey, and Arden was a Delaware corporation, Lilly an Indiana corporation and the other defendants all citizens of New York, the jurisdiction of the Court is founded on diversity of citizenship. The applicable law is the law of New York where the October 2 "agreement" was drawn and where the parties negotiated and where

essential performance was to be had. *Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

■ We have given a great deal of thought to the question of which, if any, of the issues raised can be decided on a motion for summary judgment. If the defendants are right that based upon New York law the written instrument is for construction by the Court, that it is deficient, and that no parol evidence can remedy its deficiencies then summary judgment must be granted for the defendants. *Boro Hall Corp. v. General Motors Corp.,* 164 F.2d 770 (2 Cir. 1947); *Freeman v. Continental Gin Co.,* 381 F.2d 459, 467 (5 Cir. 1967).

On the other hand "all doubts as to the existence of a 'genuine issue as to any material fact' must be resolved against the moving party * * * the District Court must, therefore, take that view of the evidence most favorable to the opponent of the moving party, giving the opponent the benefit of all favorable inferences that may reasonably be drawn." *Empire Electronics Co. v. United States,* 311 F.2d 175, 180 (2 Cir. 1962). See also *Rosenfeld v. Black,* 445 F.2d 1337 (2 Cir. 1971).

The threshold question concerns the nature of the October 2 letter agreement. The defendants urge that upon its face it cannot be held a binding contract because of the lack of essential terms.

■ We believe that the October 2 letter agreement does have the essential elements with respect to subject matter required for a contract. There was agreement for the sale of Arden as a going concern for a fixed price. It was a sale of *all* its assets including the shares in its subsidiaries and the assumption of all disclosed liabilities as well as the undisclosed liabilities of the subsidiaries. The price was subject to decrease on a fixed formula in relation to a stated book value of $22 million as shown on the consolidated balance sheet of June 30, 1970. The operations after June 30, 1970 were to be for the account

of the buyer since the relevant consolidated balance sheet remained that of June 30, 1970. The provision for an escrow fund and indemnification in the October 2 letter determined the limits of the postclosing exposure of Arden. The several references to undisclosed liabilities indicate that the main concern of the buyer was the integrity of a balance sheet for which it was paying more than fifty per cent above the book value.

The defendants maintain, however, that essential terms were lacking under New York law which makes the writing less than a binding contract (see Willmott v. Giarraputo, 5 N.Y.2d 250, 253, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959) ); Ansorge v. Kane, 244 N.Y. 395, 155 N.E. 683 (1927)). They emphasize the following "essential" elements which were still undetermined: (1) the date of closing or a date by which the "mutually satisfactory purchase agreement" was to be executed; (2) the failure to include the representations, warranties and other provisions that might ultimately affect the purchase price; (3) the leaving to further negotiation of important questions relating to the escrow fund; (4) the failure to establish the accounting procedures that were to be used to "verify" net worth.

These "omissions" are not fatal to a determination that the minds of the parties had met on the essentials of the transaction.

■ 1. The omission of a closing date or a date for the execution of the formal agreement is not fatal. A reasonable time may be implied (Heyman Cohen & Sons, Inc. v. M. Lurie Woolen Co., Inc., 232 N.Y. 112, 114, 133 N.E. 370 (1921) ). In a purchase of this seize—a far flung business—it would be reasonable to find that a difference of a few months in the date of closing would not be material.

■ 2. The essential warranty here was that against undisclosed liability and that is specifically mentioned. The tenor of the October 2 letter indicates that the buyer was willing to take the going concern generally "as is." It is unlikely that the failure to mention such matters as union contracts, supply contracts, long term employment contracts, pension plans or leases of property was deliberately intended to leave these matters open. We read the October 2 letter to mean that the buyer was willing to take Arden as a going concern, whatever its economic burdens, based on its balance sheet and on a multiple of its earnings deemed satisfactory by the buyer. The buyer, on the other hand, would not be required to make any special or unconventional warranties since it was paying cash.

■ 3. The terms of the escrow fund are said to be insufficient because there is no agreement on whether the 1.-2 million dollars was to be invested or simply held back by Cyanamid and, if invested, who was to get the interest earned. This seems a make-shift argument. An escrow fund means that it is to be in the possession of an escrowee—a third party; and it would be assumed generally that the purchase price having been paid and belonging to the seller (unless later decreased under the escrow agreement) the interest would accrue to the seller.

■ 4. Nor are we troubled by the failure to state the accounting procedures to be used to "verify" net worth. The June 30, 1970 balance sheet was unaudited. The outside auditors for Cyanamid were to have an opportunity to verify "to the extent determined by Cyanamid" whether the changes from the last audited balance sheet complied with the same accounting procedures previously used. The value of the inventory would presumably be the most difficult item. Without a fresh physical inventory the verification of the inventory as of June 1970 could, as defendants suggest, be made under different methods. So to a lesser degree could the verification of the reserve for accounts receivable. We think the parties settled the question by mutual agreement when they provided for "a third nationally

recognized public accounting firm to make a final and binding determination." This was a provision for binding arbitration which is sufficient for an objective "verification" of the June 30, 1970 balance sheet.

■■ Although the October 2 letter may have had the essential terms required that still does not make the October 2 letter a binding contract because it lacks mutuality of obligation (Chiapparelli v. Baker, Kellogg & Co., 252 N.Y. 192, 200, 169 N.E. 274, 277 (1929) ), since it contains the further provision quoted in footnote 3 and Cyanamid was not yet bound.[4] But as an offer, we believe that it was sufficiently detailed for an acceptance to bind the parties.

■ That brings us to the question whether the October 2 letter may be construed, as the plaintiff contends, as an offer irrevocable for a reasonable time until the Cyanamid board could act. New York General Obligations Law, McKinney's Consol.Laws, c. 24–A, § 5–1109 provides:

> "Except as otherwise provided in section 2–205 of the uniform commercial code with respect to an offer by a merchant to buy or sell goods, when an offer to enter into a contract is made in a writing signed by the offeror, or by his agent, which states that the offer is irrevocable during a period set forth or until a time fixed, the offer shall not be revocable during such period or until such time because of the absence of consideration for the assurance of irrevocability. When such a writing states that the offer is irrevocable but does not state any period or time of irrevocability, it shall

be construed to state that the offer is irrevocable for a reasonable time."

Although this statute has been on the books since 1941 the New York Courts apparently have not had occasion to consider it. The Court of Appeals for this Circuit, in a case applying New York law, has construed it. See Jarka Corp. v. Hellenic Lines, Ltd., 182 F.2d 916 (2 Cir. 1950). There a writing was held not to be a contract for lack of mutuality, but it contained a provision for thirty days notice of termination which was held to imply a clear intent to keep the offer open until thirty days after notice of termination had been given. The Court held that the use of the word "irrevocable" is not essential if a clear intent to make the offer irrevocable is stated (182 F.2d at 918–919).

If the condition of the October 2 letter in this action had been that the Cyanamid board must have acted within a reasonable time, Jarka would imply that the failure to use the precise word "irrevocable" would not be fatal. The words actually used lend themselves to a similar interpretation. The phrase used "consummation of such acquisition" obviously means the "closing of title." To consummate means to complete something already begun. After the prior approval by its Executive Committee, Cyanamid is to get subsequent approval from its board and this is to be done some time before "consummation" of such acquisition. The October 2 letter does not state that it is not binding *until* the Cyanamid board acts. The condition is in form a condition subsequent. Moreover, the language "if Cyanamid is unable * * * to obtain such approv-

---

4. The defendants also contend that the October 2 agreement does not satisfy the New York statute of frauds because it is a contract that may not be performed within a year (General Obligations Law § 5–701) and because it does not specify the real property to be conveyed (§ 5–703). If the October 2 agreement, signed by both parties, contains the essential terms, it satisfied § 5–701. The failure to specify particular real property when it refers to "all" the real estate owned

by Arden and its subsidiaries does not contravene the statute of frauds relating to real property. The all-inclusive description is sufficient. See Barber v. Stewart, 275 App.Div. 429, 430, 90 N.Y.S. 2d 607, 609 ((3d Dept.1949) ; see Piazza v. Sutherland, 53 Misc.2d 726, 727–728, 279 N.Y.S.2d 640, 642–643 (Sup.Ct. Suffolk Co. 1967). There is no opportunity for fraud in the case of such inclusive description.

al" [of its board] may infer that an opportunity was being given to see whether Cyanamid would be able to get its board's approval. It could hardly be "unable" until it tried. The inference may be drawn that the parties when they signed, before the appearance of Lilly as a competitor, intended in good faith that the Cyanamid board was to be given a reasonable time to act. The issue would then become narrower. Did the words used satisfy the statute? There was a writing without consideration with a condition that required action by the offeree not for agreement on essential terms but only to complete the corporate action already taken. Did the condition import an element of good faith into the offer? See Matter of De Laurentiis (Cinematografica), 9 N.Y.2d 503, 509–510, 215 N.Y.S.2d 60, 174 N.E. 2d 736 (1961); Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917); Kirke LaShelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163 (1933). Cyanamid was given the right to confirm acceptance of the offer through its corporate machinery. Did the language used protect it from revocation before it could reasonably act?

■ To determine the intention of the parties would the history of the negotiations and the contemporaneous utterances of the principal negotiators be admissible?[5] Might further discovery and actual trial elicit honest admissions that might shed light?

■ These are matters that may not be resolved on a summary judgment motion. We have been admonished that even where the so-called evidentiary facts are not in dispute but the inferences of fact to be drawn from them are disputed the Court may not award summary judgment. Empire Electronics Co. v. United States, *supra;* see Winter Park Tel. Co. v. Southern Bell Tel. & Tel. Co., 181 F.2d 341 (5 Cir. 1950). And summary judgment is inappropriate where extrinsic evidence may be admissible. See Lemelson v. Ideal Toy Corp., 408 F.2d 860 (2 Cir. 1969); Nathan v. Monthly Review Press, Inc., 309 F.Supp. 130 (S.D.N.Y.1969).

■ If the October 2 letter agreement is held to be an option irrevocable for a reasonable time the acceptance of which would mature the contract, then the requirement of a formal purchase agreement would not necessarily defeat the contract if the Cyanamid board ratified the October 2 agreement. The trial Court might consider the New York authorities which hold that the provision for the execution of a formal contract does not destroy an agreement which already contains the essential terms. Sanders v. Pottlitzer Bros. Fruit Co., 144 N.Y. 209, 39 N.E. 75 (1894); see also Itek Corp. v. Chicago Aerial Industries, Inc., 248 A.2d 625 (Del.1968), reversing a summary judgment. Nor does the condition requiring a "mutually satisfactory purchase agreement" necessarily exclude a "reasonably satisfactory" purchase agreement. Bondy v. Harvey, 62 F.2d 521, 524 (2 Cir.), cert. den. sub. nom. Harvey v. Bondy, 289 U. S. 740, 53 S.Ct. 659, 77 L.Ed. 1487 (1933); Borg-Warner Corp. v. Anchor Coupling Co., 16 Ill.2d 234, 245, 156 N. E.2d 513, 518 (1958). And surely it would not normally permit the other contracting party simply to do nothing and defeat the drafting of any purchase

5. See 1 Corbin on Contracts § 30; Mid-Continent Tel. Corp. v. Home Tel. Co., 319 F.Supp. 1176, 1191 (D.Miss.1970). The parol evidence question, being one of substantive law, would be governed by New York law. Consideration might be given to the following by the trial Judge if he finds that any parol evidence is admissible: Whether there is ambiguity of meaning; Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 57, 110 N.E. 2d 551 (1953); Union Ins. Society of Canton, Ltd. v. William Gluckin & Co., 353 F.2d 946 (2 Cir. 1965); Corbin on Contracts § 593; or whether there is evidence of a consistent additional term such as in the circumstances might naturally be omitted from the writing. Restatement 2d, Contracts, Tent. Draft No. 6 § 242 (1971). See Hicks v. Bush, 10 N.Y.2d 488, 493, 225 N.Y.S.2d 34, 180 N.E. 2d 425 (1962).

agreement at all. (See the "good faith" cases cited *supra.*)

The Court need hardly note that it is not passing judgment on the ultimate issues but merely finding them to exist. Nor is it attempting to do any more than to decide this motion on *these* facts. Grave matters of policy are involved in construing the meaning of General Obligations Law § 5–1109. In general, on a balancing of the interests of free competition and predictability of commercial transactions, on the one hand, and the embarrassment of having to ask the other party for his written word instead of his handshake, the balance weighs heavily in favor of the former. The question here, however, is whether within the statutory requirement, the plaintiff did get the defendants' written word as well as their handshakes. That is the question we may not decide now.

No claim for relief is stated against the Executor-defendants, however, either individually or in their capacity as Executors of the Arden Estate. The transaction was a purchase of assets from the Arden corporation. In their relations with the plaintiff the Executors were acting for the corporation after the October 2 letter. While for some unknown reason the October 7 telegram of repudiation was signed "Bliss, Bank of New York" it was obviously intended as a revocation by Arden with Bliss acting as agent. On any other construction the telegram would not have been a revocation by Arden itself and the ratification by Cyanamid's board would have been timely. Since no one has made that contention it is clear that all concerned assumed that Bliss was speaking as agent for Arden.

Acting in their corporate capacities the Executors cannot be liable unless there was malice or fraud or something analogous. In this case there can be no dispute that the Executors acted upon advice of counsel in performance of their duties with respect to the corporation and the Estate. They were in a difficult position as fiduciaries because of the higher offer. Nothing has been suggested to rebut the fact that they thought they were required to act in the best interests of the Estate. Their motives being beyond challenge, their acts as corporate officers and shareholders were the acts of the corporation which is solely responsible if it should be held liable for breach of option. The motion of the Estate and the Executors must be granted.

## THE MOTIONS BY LILLY

While we hold that the action against Arden may not be disposed of on a motion for summary judgment the action against Lilly is a different matter.

The defendant Lilly, the successful buyer, is charged with inducing the selling defendants to breach their contract with the plaintiff. We must assume for purposes of this motion that Lilly was told by the selling defendants that there was a deal with Cyanamid. We must assume that Lilly asked to see the writing which reflects the deal and was shown the October 2 letter agreement. Plaintiff concedes, however, that "Lilly did not ask about, nor was it informed of, the facts and circumstances of prior extensive negotiations between plaintiff and the selling defendants including the prior oral agreement referred to in paragraph 7 above" (9g Statement of Plaintiff ¶ 16).[6] It is, therefore, conceded

6. Paragraph 7 reads: "The parties prior oral agreement arose out of the Selling Defendants' and their agents' promises to plaintiff on at least four occasions that: (i) the sale of Arden would not be conducted as an auction; (ii) plaintiff's terms would not be shown to others; and (iii) once plaintiff and the Selling Defendants had agreed on basic terms for the acquisition, Arden would not be offered to any other party pending resolution of plaintiff's proposed acquisition of Arden. The Selling Defendants and their representatives made these assurances to induce plaintiff to investigate and negotiate for Arden and plaintiff would not have proceeded further but for such assurances. In reliance on and in consid-

608

that the only knowledge by Lilly of the relationship between plaintiff and the selling defendants was contained within the four corners of the October 2 letter agreement.

Without knowledge of the circumstances of the background of the negotiations between the plaintiff and the selling defendants, and without knowing that Cyanamid would assert it to be an irrevocable option, the October 2 letter on its face would not appear to be binding. A reasonably prudent person would not, in the circumstances, have assumed, as a matter of law, that there was a binding agreement. If the trial Court should allow the parol evidence it would, in no event, be admissible against Lilly, for it was not privy to the discussions.

The question remains whether the assertion by the Arden people that they had a deal with Cyanamid cast a duty upon Lilly and, if it did, the nature of that duty. Was Lilly required to walk away because the representatives of Arden said they had already had a deal or was Lilly entitled, as a matter of self-interest, to examine whether there actually was a deal? If Lilly, viewing the October 2 letter, reasonably believed there was no binding obligation in existence was it then free to act? These questions test the reach of the relatively modern tort of inducing breach of contract in New York.

■ Malice, in the sense of intending actual harm because of spite or ill feeling is, of course, not a requisite to the tort of inducing breach of contract (Lord Lindley in South Wales Miners' Federation v. Glamorgan Coal Co. [1905] A.C. 239). Knowledge of the existence of the contract is enough and implies malice. Judge McLaughlin wrote in Lamb v. S. Cheney & Son, 227 N.Y. 418, 422, 125 N.E. 817, 818 (1920): "The gist of the action is not the intent to injure, but to interfere without justification with plaintiff's contractual rights *with knowledge thereof*," (empha-

sis supplied). See also Campbell v. Gates, 236 N.Y. 457, 460, 141 N.E. 914 (1923). As the New York Court of Appeals has stated:

"For [the plaintiff] to succeed on his *second cause of action* [for inducing breach of contract] he would have to prove: (1) the existence of a valid contract between [the other 'contracting party'] and himself; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach of that contract by [the other party], and (4) damages." Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 4, 134 N.E.2d 97, 99 (1956).

See also Associated Flour Haulers & Warehousemen v. Hoffman, 282 N.Y. 173, 26 N.E.2d 7 (1940).

■ But where actual knowledge of the existence of a contract cannot be reasonably attributed to the alleged tort-feasor the implication of malice must fall. For the tort requires an intention to do an unlawful act. The intention to induce a party to "breach" a contract that was not known to be a contract is a contradiction which cannot be implied. One must know there is a contract before he can be found to have intended to do an unlawful act by inducing its breach. While it is true that inducing breach of a known firm contract cancellable by one party is actionable (Lurie v. New Amsterdam Casualty Co., 270 N.Y. 379, 1 N.E.2d 472 (1936) no such knowledge can fairly be imputed to a reader of the October 2 letter agreement newly arrived upon the scene.

■ We are constrained to hold, therefore, in the light of the plaintiff's concession and of the inadmissibility of the prior negotiations against Lilly that there are no material issues to be tried in the action against Lilly. Its offer of a higher price would be relevant, indeed, to a finding of legal malice but only if the knowledge of an obligation already existing was brought home to it. The

eration of these promises plaintiff undertook and completed an in-depth and

expensive investigation of Arden and negotiated for and agreed to its purchase."

question of what the New York law would be in these circumstances has to be faced now. See Boro Hall Corp. v. General Motors Corp., *supra*. Since we believe that the question of whether the October 2 letter agreement on its face permits the finding of a prima facie tort is a question of law, we now hold that agreement, as a matter of New York law, to be insufficient on its face to bind a third party competitor. Competition in the market place may not be stifled unless there is intentional wrong to a known contractual relation. The Court of Appeals for this Circuit may have a chance to make its own prediction of New York law before the trial of the joint action if there is an appeal of our grant of summary judgment for Lilly.

The motion to dismiss the complaint and for summary judgment by Arden is denied. The motions for summary judgment by the Estate and the Executor-defendants and by Lilly are granted.

So ordered.