[Civ. No. 30478. Second Dist., Div. Two. June 6, 1967.]

SARA LEYSE, Plaintiff and Appellant, v. NORMAN LEYSE, Defendant and Respondent.

A. G. Van Deventer for Plaintiff and Appellant.

Holmes, Ross, Woodson, Millard & Ryburn and Lorne J. Brown for Defendant and Respondent.

HERNDON, J.—Plaintiff wife appeals from those portions of the interlocutory judgment of divorce entered herein which determine the rights of the parties in two items of property. The judgment grants each party a divorce on the ground of the extreme cruelty of the other. Appellant does not challenge this determination. Her notice of appeal is specifically directed and restricted to the following provisions of the judgment:

"4. Mutual Life Insurance Company of New York insurance policy number 3071347 on the life of NORMAN LEYSE in the face amount of $5,000.00 is awarded to NORMAN LEYSE as his sole and separate property and SARA LEYSE shall restore immediate possession of said policy to NORMAN LEYSE.

"5. All those certificate shares or stock assignments on those shares held in the form of reinvested dividends with the American Telephone and Telegraph Company, Massachusetts Investors Trust or General Motors Corporation shall upon the entry of this interlocutory decree of divorce be properly endorsed by the parties and the same sent into said companies or their agents for transfer and reissuance; one-half thereof to be re-registered and reissued in the name of the plaintiff and cross-defendant, SARA LEYSE, and one-half thereof to be reissued and re-registered in the names of defendant's daughters, Helen Leyse Mutchow and Elizabeth Leyse Marling.

"6. The parties are ordered to execute all documents that

may hereafter be required to accomplish said re-registration and reissuance of said shares and the transfer of said insurance policy.''

By way of assignment of error appellant contends that the court erred (1) in failing to sustain her demurrer and motion to strike the second cause of action set forth in respondent's cross-complaint; (2) in receiving parol evidence relating to the manner in which the parties had executed a certain written agreement and their intent in regard thereto; and (3) in making certain findings of fact and conclusions of law for which there was insufficient evidentiary support.

After reviewing the record in the light most favorable to the judgment, as we are required to do by accepted rules of appellate procedure, it appears that the facts as found by the trial court and as hereinafter recited are either undisputed or well supported by substantial evidence.

The parties were married on March 15, 1948, at Milwaukee, Wisconsin. At that time appellant was 45 years of age and respondent was 65. There were no children the issue of their marriage, but each party had children born during prior marriages. The parties separated February 15, 1965. At the date of entry of the interlocutory judgment appellant was 63 years of age and employed in a dress shop in San Marino, California, and respondent was 83 years of age, unemployable, and had been hospitalized on four occasions within recent years. As previously indicated, the trial court determined that each party was entitled to a divorce by reason of the extreme cruelty of the other, and the findings to this effect are not questioned on this appeal.

The historical background of the issues actually presented for our determination is as follows: Prior to the time the parties were married they executed a prenuptial agreement which provided, in substance, that appellant would receive $100 upon execution of the agreement and immediately after solemnization of their proposed marriage respondent would assign and deliver to her a certain life insurance policy then having a cash surrender value of $2,440.10. Respondent agreed thereafter to pay all premiums when they became due and that the assignment and delivery of the policy would be recorded with the insurance company and ''shall vest all incidents of ownership together with the right to change or designate the beneficiary thereof in [appellant].''

This agreement of February 28, 1948, further provided that respondent would maintain the home he then owned so long as

the parties lived together as man and wife and if they were thus living together at the time of his death, then by last will and testament or other instrument respondent would devise appellant an estate therein for her life or until her remarriage, together with the use of all household furniture and furnishings therein. Appellant agreed to accept the terms of this agreement in lieu of any and all of her rights and interests in and to respondent's property, then owned or thereafter acquired, including dower rights, rights as an heir and claims for allowance and support.

The agreement further provided that although it was intended to limit the right of either party to participate in the estate of the other, whether the marriage relationship "terminated by death *or legal proceedings*" (italics added), nevertheless it should not in any manner bar or affect the right of the parties to claim and receive any property the other might "give, devise, or bequeath, or transfer, assign, or set over, or become obligated to transfer, assign and set over . . . in addition to the provisions herein made for the purpose hereinabove expressed."

Following the marriage of the parties, the residence specifically referred to in the agreement was sold with mutual consent and another home was purchased with the proceeds thereof. It was understood that appellant would have the same contingent interest in this "replacement" residence as she had in the property described in the pre-nuptial agreement. Later this second residence was sold by mutual agreement and the parties moved to California where they determined to rent rather than purchase another home. The proceeds of the sale of their second residence and other moneys accumulated from respondent's pension were invested in certain shares of stock that were placed in joint tenancy. It is conceded that appellant had no assets at the time the parties married and neither received any separate property from others nor worked outside the home during the marriage. The income of the parties throughout the marriage was derived from respondent's pension and social security benefits and from dividends paid upon the stock purchased with the proceeds from the sale of the home.

The parties apparently resided together harmoniously until January or February 1959, when respondent was hospitalized as the result of a nervous breakdown and underwent a course of treatment which included the administration of electro-

shock treatments. Thereafter, pursuant to his doctor's orders, respondent visited his daughters in Wisconsin for approximately six weeks. During this period appellant, who remained in California, consulted her attorney concerning her property rights in view of the changed circumstances of the parties since the execution of their prenuptial agreement.

As a result of this consultation appellant's counsel prepared a "Memorandum of Agreement" that referred to the parties' prenuptial agreement and the changed circumstances of the parties, and then stated that "this memorandum is intended to constitute a written record of the agreements of the parties, and is mutually executed by them to clarify certain provisions of said pre-nupial agreement."

This memorandum agreement was executed by both parties and by respondent's daughters on June 22, 1959, following respondent's return to California in April or May of that year. It provided that the shares of stock purchased with the proceeds of the sale of real property "are now vested in the names of the parties hereto as Joint Tenants with full rights of survivorship and not as tenants in common. Each party agrees that title to none of said securities at any time subsequent to the date hereof shall be vested in any other manner, both parties expressly intending that the survivor of them shall take the same upon the death of the first of them to die, and each party agrees to refrain from any act intended to destroy said joint tenancy vestings."

The memorandum agreement further provided that respondent would attempt to have a corporation he had formerly owned adopt a resolution agreeing to pay appellant $125 per month following his death and continuing until her death, remarriage or attainment of age 62. Respondent's daughters executed this agreement and promised that if the corporation failed or refused to make these payments, they would make them personally. The agreement stated that this commitment of respondent's daughters stemmed "from the desire on their part to have their father, Norman Leyse, receive good and proper care and there shall be no liability on their part to fulfill any of the terms of this contract if Mr. and Mrs. Norman Leyse, the husband and the wife, are not living together as man and wife at the time of the death of the husband, Norman Leyse."

Finally, the memorandum agreement referred to a life insurance policy in the face amount of $5,000 carried upon the husband's life and payable to the wife as primary benefi-

ciary. Although this policy is not identified in the agreement, it appears that it is the same policy ownership of which had vested in respondent in 1948 immediately after the solemnization of their marriage. If this is true then, of course, it is apparent that the husband's reiterated promise in the memorandum agreement to pay the premiums on this policy and to maintain the wife as the primary beneficiary thereunder added nothing to the commitment he previously had made and for which full consideration had been given. That is to say, unlike appellant's contingent rights in the residence, the sole condition precedent to the vesting of her ownership of this insurance policy was the marriage of the parties.

It is manifest from the record that by reason of his then mental and physical condition, and the treatment he had received therefor, respondent at the time he executed this memorandum agreement was not possessed of that state of mind most conducive to an understanding of the complexities thereof.[1] Respondent testified that he simply signed the agreement because he "wanted to keep peace in the home" and he always had intended appellant to have their property if she remained his wife at the time of his death. However, he did not understand, and certainly did not intend that, contrary to the provisions of their original agreement, appellant now could abandon him and still retain her rights of survivorship in the totality of his assets and even prevent him from disposing of his one-half interest therein during his lifetime regardless of his need or desire so to do. He testified that by reason of his mental condition resulting from the electro-shock treatments, he was able to remember very little that occurred during the period in which the memorandum agreement was drawn and executed. Although his daughters had consulted with their attorney in connection with their obligations under this agreement, respondent had received no independent legal advice and "did not recall" appellant's attorney explaining to him that this agreement was intended to create rights and obligations different from those existing under the precedent agreement which it purportedly "clarified."

Following the execution of this memorandum agreement, the parties continued to reside together in relative harmony. Respondent apparently suffered to an increasing degree the normal maladies of age and in December 1964, he was again

---

[1]Appellant, when questioned concerning his condition at that time, stated, "He wasn't well at all. He has never been well since then."

hospitalized for a short period. Thereafter he remained in a convalescent home until his return to the family residence in January 1965. Although appellant testified that she and her husband ''got along very well'' until shortly before she left him, she departed the family residence on February 15, 1965, without explanation or forewarning to him. She took with her the family car, the few thousand dollars in savings the parties had accumulated in various banks and savings and loan associations and the certificates of ownership of the shares of stock standing in their joint names.

Although respondent receives a net pension of $664 per month and social security benefits in the amount of $109, at the moment of appellant's departure he concededly was in extremely poor physical health and possessed of $8.50. He subsequently called his daughters in Wisconsin and they returned him to that state to reside with them. On April 2, 1965, respondent executed a document expressing his desire to terminate the joint tenancy estate in the stock owned by the parties and concurrently transferring his interest therein to his daughters.

Appellant filed her complaint for divorce on February 23, 1965, and respondent subsequently filed a cross-complaint wherein, in addition to seeking a divorce, he added a second ''cause of action'' by which he sought judicial confirmation of his rescission of the 1959 memorandum agreement and his termination of the joint tenancy previously existing in the stocks owned by the parties. Appellant's demurrer was overruled and her motion to strike this part of respondent's cross-complaint was denied. Following a full trial the court made findings consistent with the recital of the facts set forth herein, and further found:

''No. 32. The Memorandum of Agreement dated June 22, 1959, was entered into by Defendant and Cross-Complainant with the understanding and agreement with Plaintiff and Cross-Defendant that she would continue to be his wife and live with him and take care of him until he died. Plaintiff and Cross-Defendant separated from Defendant and Cross-Complainant on February 15, 1965, and has refused to live with said Defendant and Cross-Complainant or take care of him or prepare proper meals for him as a wife should since said date and that the consideration for said Agreement has failed and that Defendant and Cross-Complainant had the legal right to terminate the joint tenancy vesting of the stock in question at any time on or after February 15, 1965.

"No. 33. The Court finds that Defendant and Cross-Complainant terminated the joint tenancy on April 2, 1965, by conveying his interest therein to Helen Leyse Mutchow and Elizabeth Leyse Marling.''

Based upon these findings and the conclusions of law drawn therefrom, the court entered judgment containing those provisions from which appellant prosecutes this appeal. Considering first the propriety of the court's order overruling appellant's demurrer and denying her motion to strike, we conclude that the trial court's rulings were proper.

■ It is unquestionably true that in an ordinary divorce proceeding the court has no power to divide separate property or property determined to be held in true joint tenancy (cf. Civ. Code, § 146; *Davis* v. *Davis*, 222 Cal.App.2d 691, 693 [35 Cal.Rptr. 281]). However, it does not follow that a court of equity trying a divorce action may not determine the validity, effect and application of the provisions of a property settlement executed by the parties during their marriage. A similar contention was disposed of by this court in *Mergenthaler* v. *Mergenthaler*, 69 Cal.App2d 525, 528 [160 P.2d 212] et seq. in the followng apposite language:

"Appellant vainly contends that respondent's demand for money advanced during her marriage was improperly united with her action for divorce. The obligation had its genesis in the marital status. It was proper upon a dissolution of the marriage for the court to determine all issues arising as a result of that relation. It is a principle of chancery that a court of equity will if possible dispose of all issues between the litigants in one judgment in order to preclude further litigation. [Citations.] The same practice has been carried into legal transactions to avoid a circuity of action and multiplicity of suits by adjudication in one judgment of all controversies of the parties arising out of a particular transaction. [Citation.] Had appellant sued respondent for divorce she would have been privileged to plead in a cross-complaint all claims against her husband originating in the marriage relation. [Citation.] This would include claims for restoration of her separate property which he might have gained unfairly. What may be claimed in a cross-complaint may with no less propriety be alleged in the original pleading. . . .

"[T]he demurrers were properly overruled. . . . As to the special demurrer that she combined an action for divorce with a demand for the return of her separate property, the plead-

ing is in correct form. A complaint for divorce may contain a statement of the appropriate facts, and where claim is made that the offending spouse has unjustly appropriated property of the plaintiff the latter may demand that a trust be impressed upon the community property or that a lien be fixed upon defendant's separate property or that plaintiff be otherwise made secure. [Citations.] Equity frowns upon litigation by piecemeal. [Citation.] When it has once obtained jurisdiction of a cause, equity will dispose of the entire controversy. [Citations.]''

Similarly in the instant case it would have been entirely pointless and wasteful for the trial court to relegate the trial of the issues as to the effectiveness of respondent's rescission of the 1959 agreement and his termination of the joint tenancy in the stock owned by the parties to a later proceeding in the same court. In the present action the trial court actually did not attempt to divide the joint tenancy property of the parties by reason of the divorce granted each of them herein. Rather, since rescission is a unilateral act under our statutes (Civ. Code, § 1689 et seq.), the trial court merely considered and approved the action theretofore taken by respondent in terminating the joint tenancy estate previously existing in their property. Civil Code section 1692 authorizes an action to obtain relief under such circumstances. The joinder of such cause of action in an action requiring determination of the marital status and property rights of the contracting parties is advantageous and economical from every standpoint.

■ The court did not err in admitting extrinsic evidence to aid it in its task of interpreting the two nonintegrated and mutually conflicting documents before it. As stated in *Pollyanna Homes, Inc.* v. *Berney,* 56 Cal.2d 676, 679-680 [16 Cal. Rptr. 345, 365 P.2d 401]:

■ ''Whether the parol evidence rule applies depends upon whether there was an 'integration' [citation] or 'a complete expression of the agreement of the parties . . .' [Citations.]

''Generally, finality may be determined from the writing itself. If on its face the writing purports to be a complete and final expression of the agreement, parol evidence is excluded. [Citations.]''

The 1959 Memorandum of Agreement does not contain a specific integration clause and on its face refers to the earlier prenuptial agreement of the parties thereby demonstrating

that it was never intended to be a complete expression of the agreement of the parties on the subject. The 1959 agreement does not specifically provide that the parties thereto would be bound "to refrain from any act intended to destroy" their joint tenancy ownership of the stock only so long as they continued to live together as man and wife. Neither does it specifically eliminate this requirement which previously had conditionally controlled appellant's interest in respondent's real property. The 1959 agreement purports only "to clarify" the 1948 agreement. Since the proceeds from the sale of the real property had been invested in stocks rather than in another residence, the trial court might well have determined in the absence of any extrinsic evidence that the continuance of the marital relationship expressly required by the 1948 agreement, and not specifically eliminated in the 1959 agreement, was intended by the parties to be a controlling consideration.

"Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (Civ. Code, § 1642.) "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, § 1647.) "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret." (Code Civ. Proc., § 1860.)

The interpretation placed upon the agreements of the parties by the trial court in the instant case was entirely reasonable and in no way unfair to appellant. Although the 1959 agreement is silent upon the requirement that the marital relationship continue, whereas the basic 1948 agreement makes the continuation of this relationship a condition precedent to appellant's enjoyment of even a life estate in respondent's separate property, the trial court nevertheless determined, largely on the basis of the extrinsic evidence received, that appellant had a vested one-half interest in the stocks in question that was not divested by a termination of the marital status. To have gone further and determined that respondent had given up not only his ownership and control over one-half of his separate property but had totally lost his right to use his remaining one-half interest in his property in

accordance with his needs would appear most unreasonable. (Cf. Civ. Code, § 1638.)

■ It is apparent that when respondent, at age 76, and immediately following a most serious breakdown, promised appellant, who was 20 years his junior, that he would arrange for her to receive all of his estate upon his death, both parties must have understood that such promise contemplated the continuing condition that appellant would live with him and care for him in his declining years as did the earlier and less generous provisions of the 1948 agreement. Appellant's contention that she could abandon her marital obligations, even upon the technically sufficient ground of "mental cruelty," and thereby prevent respondent from using at least the remaining one-half of his property to obtain care elsewhere is one which we cannot hold that the trial court was bound to accept as a matter of law.

Appellant's final assignment of error regarding the sufficiency of the evidence to sustain certain of the factual findings made by the trial court is meritorious only in part. Appellant is mistaken in her assertion that the evidence does not support the trial court's finding that respondent was not advised of his rights or obligations by independent counsel. She is further in error in asserting that there was no "competent" evidence to sustain the trial court's determination that respondent properly had rescinded the 1959 agreement for failure of consideration insofar as it purported to preclude him from dealing with his one-half interest in the stock held in joint tenancy after the parties' marital union had been terminated by granting each of them a divorce from the other. As we have previously indicated, such a determination is supported both by the two written agreements presented to the court and by the extrinsic evidence properly received in connection therewith.

■ However, the trial court did err in determining that the life insurance policy fully and finally assigned to the wife in 1948 should be returned to, and awarded to, the husband. As heretofore indicated, the only precedent condition to the vesting of appellant's rights of ownership in this policy was the solemnization of their contemplated marriage. The 1959 agreement in no way purported to divest her of the rights in this policy which she previously had acquired under the terms of the prenuptial agreement and respondent offered no evidence whatsoever on this subject. Therefore, that portion of

the judgment purporting to order restoration of this policy to respondent must be reversed since it is outside the issues framed by the pleadings and wholly without evidentiary support.

The judgment is reversed insofar as it purports to divest appellant of the insurance policy transferred to her unconditionally in 1948, and otherwise it is affirmed. Appellant to recover her costs on this appeal.

Roth, P. J., and Fleming, J., concurred.