741 F.2d 1555
 JEWEL COMPANIES, INC., a New York corporation, and Jewel
Acquisition Corporation, a California corporation,
Plaintiffs-Appellants,
v.
PAY LESS DRUG STORES NORTHWEST, INC., a Maryland
corporation; W.B. Armitage; Claude Bekins; Noel
Flynn; Eugene W. Guinn; Edward B.
Hart; Peyton Hawes, et al.,
Defendants-Appellees.
 No. 82-4382.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1983.
Decided Sept. 5, 1984.
 
 Stephen V. Bomse, Daniel E. Titelbaum, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for plaintiffs-appellants.
 Richard W. Canady, Robert E. Gooding, Jr., H. Mathew Moore, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., Geoffrey M. Kalmus, Alan R. Friedman, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before TANG and REINHARDT, Circuit Judges, and BURNS,* District Judge.
 REINHARDT, Circuit Judge:
 
 
 1
 This case arises out of a takeover battle for the acquisition of a publicly traded company, the Pay Less Drug Stores ("Pay Less"). Plaintiff, the Jewel Companies, Inc. ("Jewel") appeals an order granting summary judgment for the defendant, Pay Less Drug Stores Northwest, Inc., ("Northwest").[1] Jewel alleges that Northwest's actions constitute tortious interference with a merger agreement between Pay Less and Jewel. In granting summary judgment, the district court held as a matter of law that an executed and board-approved merger agreement between Pay Less and Jewel does not constitute a valid and binding contract because 1) completion of the contemplated merger required shareholder approval and 2) the Pay Less directors' fiduciary obligations prohibited them from entering into a binding merger agreement. The court further held that defendant Northwest's interference with the merger agreement between Pay Less and Jewel would in any event have been legally justified by society's interest in encouraging "free competition" in the market for corporate acquisitions. We reverse the district court's grant of summary judgment for the defendant and remand for further proceedings on the issues presented.
 
 
 2
 Most of the facts material to this appeal are not in dispute. In September 1979, Pay Less retained the investment banking firm of Goldman, Sachs & Co. to locate a merger partner. Jewel, a Chicago-based company engaged primarily in the retail grocery business, was among the companies contacted. On November 9, 1979, Jewel and Pay Less agreed to a tax-free merger in which each outstanding share of Pay Less stock would be exchanged, for .652 shares of Jewel stock. The merger agreement was executed in writing, formally approved by both boards of directors, signed on behalf of each corporation by its respective president, and made public in a press release on November 9, 1979.[2]
 
 
 3
 The merger agreement included several covenants the meaning of which is in dispute and is central to the issues before us on appeal. Articles 9.9 and 10.5 of the Jewel-Pay Less merger agreement obligated the board of directors of each firm to "use its best efforts to fulfill those conditions ... over which it has control or influence and to consummate the Merger." Pay Less was further obligated under article 9 of the agreement to forbear from the sale or transfer of any of its properties or assets, and from entering into or terminating any contract other than in the ordinary course of business. The merger agreement further provided that Pay Less could not "agree to, or make any commitment to" effect any sale, transfer, or extraordinary action prohibited in Article 9. Article 7 of the Jewel-Pay Less merger agreement incorporated several prerequisites to closing the transaction. The obligations of both firms to consummate the merger were conditioned upon Pay Less obtaining the affirmative vote of a majority of the outstanding shares of Pay Less stock. The obligation of each firm to close the transaction was also contingent upon Jewel obtaining the required governmental consents.
 
 
 4
 Northwest had discussed the possibility of a merger with Pay Less several times in the 1970s. When the Jewel-Pay Less merger agreement was publicly announced, Northwest's management considered making a competing bid to acquire Pay Less. Between December 14 and December 28 Northwest purchased approximately 269,000 shares (over 12% of the outstanding shares) of Pay Less stock in open market transactions. Northwest then filed a schedule 13D, as required by the Williams Act, 15 U.S.C. Secs. 78m(d)-(e), 78n(d)-(e). Northwest made public its intention to make a competing bid in a press release issued December 31, 1979. At that time Northwest offered $22.50 per share for Pay Less stock. The press release further stated that Northwest intended "to condition its obligation to purchase tendered shares on Pay Less's Board of Directors abandoning the previously announced proposal to merge with a subsidiary of Jewel Companies, Inc."
 
 
 5
 Two days later Jewel filed this action in state court, seeking a temporary restraining order against Northwest's tender offer and alleging tortious interference with contract and violations of state unfair competition and antitrust laws. Jewel has subsequently abandoned its antitrust and unfair competition claims.
 
 
 6
 The Northwest tender offer was formally commenced on January 17 by the filing of a schedule 14D-1 statement with the Securities and Exchange Commission. At this point the battle for control of Pay Less escalated. On January 24, Jewel amended its complaint and added allegations that Northwest's Schedule 14D-1 statement was false and misleading and that its tender offer violated both the federal securities and antitrust laws. These claims, like most of Jewel's earlier claims, have since been dropped. On January 29, as a 10% shareholder of Pay Less, Jewel called a shareholders' meeting to take place on March 4 for the purpose of voting on the Jewel-Pay Less merger agreement, thereby hoping to conclude the balloting before Northwest became record owner of the shares tendered.
 
 
 7
 Northwest increased its tender offer price to $24 per share on February 1 and Pay Less' Board of Directors unanimously recommended that its shareholders accept the Northwest offer. On this date Northwest and Pay Less, through its Board of Directors, entered into an Indemnity and Record Date Agreement which provided in relevant part that:
 
 
 8
 (1) Northwest would indemnify Pay Less and its directors for any alleged breach of the Jewel Agreement;
 
 
 9
 (2) February 23, 1980 would be the record date for determining the shareholders eligible to vote on the Jewel proposal. March 1, 1980, or not less than ten New York Stock Exchange trading days following the expiration date of the tender offer in the event that the tender offer were extended, would be the record date for determining the shareholders entitled to notice of and to vote on the Northwest merger agreement;
 
 
 10
 (3) if for some reason a majority of the record owners of Pay Less stock did approve the Jewel merger (a theoretical possibility if the mechanics of recording the transfer of shares on the corporate records were not completed by the Jewel record date, set for February 23, 1980), then the Pay Less Board of Directors would nevertheless abandon the Jewel merger pursuant to Cal.Corp. Code Sec. 1105 (West 1977); and, (4) Northwest and Pay Less would issue a joint press release in which Pay Less would make a recommendation to its shareholders in favor of acceptance of the tender offer, including a statement to the effect that the price offered under the tender offer is significantly more favorable to its shareholders generally than the terms offered under the Jewel Merger Agreement.
 
 
 11
 Finally, on February 1, the Pay Less Board signed a merger agreement with Northwest. The board sent all of its shareholders a 29-page letter comparing the two merger offers and setting forth the history of the two proposals. Although it unanimously recommended the Northwest offer, Pay Less advised its shareholders that the March 4 meeting to consider the Jewel merger agreement would go forward as scheduled.
 
 
 12
 By February 25, a majority of Pay Less's shares had been tendered to Northwest and Jewel withdrew its request for a shareholders' meeting. The meeting nevertheless took place as scheduled on March 4. Northwest, by then the majority shareholder, passed a shareholder resolution rejecting the Jewel merger agreement. The Pay Less Board, which had been reconstituted to include a majority of Northwest representatives, terminated the Jewel agreement. On March 7, Jewel tendered the 297,010 shares of Pay Less stock that it had purchased on November 9, 1979 for $15 a share to Northwest for $24 per share.
 
 
 13
 Northwest removed Jewel's initial suit for a preliminary injunction against Northwest's interference with the Jewel Agreement to federal district court shortly after it was filed. The district court denied Jewel's motion for expedited discovery and a preliminary injunction on February 6, 1980. The practical result of this order by the district court was that the Northwest merger was consummated.
 
 
 14
 Jewel has dropped all of its claims in this suit except for its claim of tortious interference with contract and prospective commercial advantage for which it now requests damages as its sole relief.[3] On August 17, 1981 Northwest moved for summary judgment on the grounds that (a) the Pay Less-Jewel Agreement did not constitute a valid "contract" and (b) Northwest was privileged to "compete" for the acquisition of Jewel notwithstanding the preexisting Jewel agreement.
 
 
 15
 Jewel opposed the motion and filed a cross-motion for summary judgment. Jewel argued that while shareholder approval may have been a pre-condition to the consummation of the merger agreement, that fact alone did not render the agreement a mere expectancy, nor did it justify Northwest's interference with the Jewel merger.
 
 
 16
 On June 1, 1982, the district court granted Northwest's motion for summary judgment and issued an opinion. Jewel Companies, Inc. v. Pay Less Drug Stores Northwest, Inc. 550 F.Supp. 770 (N.D.Cal.1982).[4]
 
 I. Standard of Review
 
 17
 In reviewing a grant of summary judgment our task is identical to that of the trial court. We must view the evidence and inferences therefrom in the light most favorable to the party opposing the motion for summary judgment. Twentieth Century-Fox Film Corp. v. MCA, Inc., 715 F.2d 1327, 1328-29 (9th Cir.1983); British Airways Board v. Boeing Co., 585 F.2d 946, 951 (9th Cir.1978) cert. denied, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). We then determine whether, on the basis of the pleadings, affidavits, depositions and other evidence available at the time the motion was made, there is any genuine issue of fact in dispute and whether the moving party is entitled to judgment as a matter of law. M/V American Queen v. San Diego Marine Const. Corp., 708 F.2d 1483, 1487 (9th Cir.1983). We review the district court's construction of California law de novo. In re William McLinn, 739 F.2d 1395 (9th Cir.1984).
 
 
 18
 II. The Role of the Board of Directors in a Negotiated Merger Transaction Under the California Corporate Code
 
 
 19
 The district court rejected plaintiff's claim that defendant Northwest tortiously induced Pay Less to breach its merger agreement with Jewel on the ground, inter alia, that the Jewel-Pay Less agreement was not a valid contract. The district court ruled that under California law, a merger agreement entered into by the boards of directors of two corporations has no legal effect prior to shareholder approval.
 
 
 20
 The view of negotiated merger transactions expressed by the district court is at odds with the provisions of the California Corporate Code. According to the district court's ruling, the board of directors of a corporation may never bind itself in a merger agreement to exert its best efforts to obtain the requisite shareholders' approval or to forbear from entering into a competing arrangement with another firm pending approval or rejection by the shareholders. In so ruling, the district court has circumscribed the role of corporate boards of directors in a manner which contravenes their traditional management function and which is contrary to the law of California.
 
 
 21
 The California Corporate Code provides in the broadest terms that "the business and affairs of the corporation shall be managed and all corporate powers shall be exercised by or under the direction of the board." Cal.Corp. Code Sec. 300(a) (West Supp.1984). Accordingly, directors routinely exercise their business judgment to determine whether or not to enter into contracts or to embark on new business ventures. Lewis v. Anderson 615 F.2d 778, 781-82 (9th Cir.1979) cert. denied, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); 2 W. Fletcher, Cyclopedia of the Law of Private Corporations, Sec. 505 (1981).[5]
 
 
 22
 The role of the board of directors of a corporation embroiled in a corporate control controversy is not different. Courts have uniformly held that when faced with a hostile takeover bid, corporate directors must exercise their business judgment in accordance with their function as the managers of the firm and with their role as fiduciaries to all of the corporation's shareholders. E.g., Klaus v. Hi-Shear Corp., 528 F.2d 225, 233-34 (9th Cir.1975); Panter v. Marshall Field & Co., 646 F.2d 271, 288 (7th Cir.1981). Similarly, the initial decision as to whether to enter into a negotiated merger transaction is one which should be made in accordance with the business judgment of the board. While the actions of a board of directors in a corporate control transaction may be subject to special scrutiny under both the business judgment rule and the fairness test, see, Jones v. H.F. Ahmanson & Co., 1 Cal.3d 93, 108, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); H. Henn & John Alexander Laws of Corporations, 637-644, 656-663, 986 (3d ed. 1983); Gilson, A Structural Approach to Corporations: The Case Against Defensive Tactics in Tender Offers, 33 Stan.L.Rev. 819, 821-31 (1981), there is nothing so unique about a negotiated merger transaction as to warrant the extraordinary step of sterilizing the directors in favor of direct and exclusive action by the shareholders. See Lipton, Takeover Bids in the Target's Boardroom, 35 Bus.Law 101, 104 (1979); Cal.Corp. Code Sec. 1100 (West 1977). Cf. Cheff v. Mathes, 41 Del.Ch. 494, 199 A.2d 548 (1964) (directors actions in averting takeover will be upheld by court if reasonable and taken in good faith).
 
 
 23
 Far from diminishing the role of the board in negotiated merger transactions, the California Corporate Code confers considerable latitude on the directors. The Code explicitly provides that the board has broad authority to determine whether to merge its firm, to select a merger partner, and to negotiate the terms on which such a transaction is to take place. To this end, section 1101 of the Code specifically states that a merger agreement embodying these decisions must be negotiated and signed by the two boards prior to consummation of the transaction.[6]
 
 
 24
 Other provisions of California's Corporate Code strongly indicate that merger agreements contemplated by section 1101 are considered binding contracts between the two boards. Section 1200 of the California Corporate Code requires that all "corporate reorganizations," a definition which includes negotiated merger transactions pursuant to Chapter 11 of the Code, must be approved by the board of each corporation which will either acquire or divest itself of property or assets in a non-cash merger.[7] But where consummation of such a transaction requires shareholder approval, the shareholders need only approve "the principal terms of a reorganization." Cal.Corp. Code Sec. 1201(a) (West Supp.1984). Moreover, section 1201(f) further provides that "[A]ny [shareholder] approval required by this section may be given before or after the approval by the board."[8]
 
 
 25
 We therefore conclude that the California Corporate Code contemplates that the boards of two corporations seeking merger or reorganization under Chapters 11 and 12 of the California Corporate Code may enter into a binding merger agreement governing the conduct of the parties pending submission of the agreement to the shareholders for approval. The critical issue in the appeal before us then becomes whether such a merger agreement can be exclusive, i.e., whether the board may lawfully agree in such a merger agreement to forbear from entering into competing and inconsistent agreements until the shareholders' vote occurs.
 
 
 26
 In considering the question whether a board of a California corporation is precluded from entering into an exclusive merger agreement, we are aware that some commentators have advocated the theory that in a hostile takeover battle the board should remain passive and not engage in defensive tactics. See e.g., Easterbrook and Fishel, Takeover Bids, Defensive Tactics and Shareholders' Welfare 36 Bus.Law 1733 (1981); Gilson, A Structural Approach to Corporations: The Case Against Defensive Tactics in Tender Offers, 33 Stan.L.Rev. 819 (1981). Recently, some of these commentators have proposed that even in a negotiated merger transaction the board's role should be limited to the role of auctioneer, i.e., the board should neither express preferences among potential merger partners nor actively negotiate, but should simply solicit bids and pass them on to the shareholders. See Bebchuck, The Case for Facilitating Competing Tender Offers: A Reply and Extension, 35 Stan.L.Rev. 23, 25, (1984) ("The auctioneering rule has an important and desirable effect not only on unsolicited takeovers, but also on negotiated acquisitions ... because such acquisitions take place against the background of a possible unfriendly tender offer by the acquirer or by a competing potential buyer."); Gilson, Seeking Competitive Bids Versus Pure Passivity in Tender Offer Defense, 35 Stan.L.Rev. 51, 66 n. 36 (if defensive tactics in hostile takeovers were prohibited, then managers' incentives in negotiated merger transactions would "more closely parallel those of the shareholders: Get the best price (including management perquisites) possible.").
 
 
 27
 While we express no view on the policy merits of that proposal, we are convinced, after examining California law, that the Corporate Code of California does not adopt the auction model in regulating negotiated acquisitions. To the contrary, California's regulatory scheme for negotiated merger transactions is predicated on the idea that the board of directors of each merging entity will deliberate upon a decision and then negotiate and execute a merger agreement of the type that it, in its business judgment, deems best for the shareholders. See California Corporate Code Chapters 11 and 12 (West Supp.1984).
 
 
 28
 In light of California's statutory scheme preserving the board's traditional management function in the case of corporate control transactions, we see no reason to conclude that the drafters of the Corporate Code intended to deprive a corporate board of the authority to agree to refrain from negotiating or accepting competing offers until the shareholders have considered an initial offer. That there is no statutory intent to prohibit a board from entering an exclusive merger contract can be readily inferred from the provisions of the California Corporate Code relating to merger agreements that we have previously discussed. These provisions reinforce, and in some circumstances, serve to augment the board's basic discretion as authorized in section 300 of that Code. They seem to us to provide for a proper devolution of responsibility in a negotiated merger transaction: Full initial discretion regarding the terms of the agreement lies with the board, the ultimate determination with the shareholders.
 
 
 29
 The Code's provision for abandonment of a merger by the board is an example of the broad discretion conferred on boards of directors. That section provides that "[t]he board may, in its discretion, abandon a merger, subject to the contractual rights, if any, of third parties, including other constituent corporations, without further approval by the outstanding shares (Section 152), at any time before the merger is effective." California Corporate Code Sec. 1105 (West 1977).[9] The legislative committee report accompanying the latest revision of the California Corporate Code makes it clear that the provision is intended to extend the board's authority to act on behalf of its corporation beyond the time at which the shareholders have considered a transaction. Report of the Assembly Select Committee on the Revision of the California Corporate Code.[10]
 
 
 30
 We do, of course, recognize that a board may not lawfully divest itself of its fiduciary obligations in a contract. See Great Western Producers Cooperative v. Great Western United Corp., 200 Colo. 180, 613 P.2d 873 (1980); Trumbo v. Bank of Berkeley, 77 Cal.App.2d 704, 176 P.2d 376 (1947) (contract in which corporate director attempts to bind his discretionary vote violates public policy and is void); Chapin v. Benwood Foundation, Inc., 402 A.2d 1205, 1210 (Del.Ch.1979) aff'd, Harrison v. Chapin, 415 A.2d 1068 (Del.1980) (a board of directors cannot legally bind itself in advance to appoint designated persons to fill vacancies on the board). However, to permit a board of directors to decide that a proposed merger transaction is in the best interests of its shareholders at a given point in time, and to agree to refrain from entering into competing contracts until the shareholders consider the proposal, does not conflict in any way with the board's fiduciary obligation. Cf. Belden Corp. v. InterNorth, Inc., 90 Ill.App.3d 547, 45 Ill.Dec. 165, 413 N.E.2d 98, 102 (1980) (in refusing to enjoin a tender offer which the plaintiff alleged constituted tortious interference with the merger agreement the court stated that the merger agreement "gives Belden [acquiring firm] an unequivocal right to receive the performance of Crouse's [target firm] management, i.e., Belden's entitled to have the merger presented and recommended to Crouse's shareholders ... Belden therefore has an enforceable expectation with regard to the performance of Crouse's management, but has a mere expectancy with respect to consummation of the merger."); Pennzoil Co. v. Getty Oil Co., No. 7425 slip op. (Del.Ch. Feb. 6, 1984).
 
 
 31
 An exclusive board-negotiated merger agreement may confer considerable benefits upon the shareholders of a firm. A potential merger partner may be reluctant to agree to a merger unless it is confident that its offer will not be used by the board simply to trigger an auction for the firm's assets. Therefore, an exclusive merger agreement may be necessary to secure the best offer for the shareholders of a firm. Cf. Grossman & Hart, Disclosure Laws and Takeover Bids, 35 J.Fin. (1980) (competition in takeovers may deter firms from investing in research on potential target and from making initial bid). An exclusive merger agreement may also be the least costly means of merging the firm. It increases the likelihood that the firm can be merged without expensive litigation or proxy battles.
 
 
 32
 It is true that in certain situations the shareholders may suffer a lost opportunity as a result of the board's entering into an exclusive merger agreement. As the district court took great pains to point out, subsequent to a contractual commitment unanticipated business opportunities and exigencies of the marketplace may render a proposed merger less desirable than when originally bargained for. But all contracts are formed at a single point in time and are based on the information available at that moment. The pursuit of competitive advantage has never been recognized at law as a sufficient reason to render void, or voidable, an otherwise valid contract, and in our view, it was not the intention of the drafters of California's Corporate Code to make this any less true of negotiated merger agreements. See Restatement (Second) of Torts, Sec. 768(2) (1979).
 
 
 33
 Moreover, in many ways shareholders have more safeguards from market losses in board negotiated transactions than in others. Even after the merger agreement is signed a board may not, consistent with its fiduciary obligations to its shareholders, withhold information regarding a potentially more attractive competing offer. See, e.g., U.S. Smelting, Refining and Mining Co. v. Clevite Corp., (1969-70 Transfer Binder) Fed.Sec.L.Rep. (CCH) Sec. 192, 691 (N.D.Ohio 1968); Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1295 (2d Cir.1973). While the board can bind itself to exert its best efforts to consummate the merger under California law,[11] it can only bind the corporation temporarily, and in limited areas,[12] pending shareholder approval. The shareholders retain the ultimate control over the corporation's assets. They remain free to accept or reject the merger proposal presented by the board, to respond to a merger proposal or tender offer made by another firm subsequent to the board's execution of exclusive merger agreement, or to hold out for a better offer. Given the benefits that may accrue to shareholders from an exclusive merger agreement, we fail to see how such an agreement would compromise their legal rights.
 
 
 34
 There are, no doubt, advantages to both exclusive and nonexclusive merger agreements. Determination of the best contract for a given transaction will depend on the particular corporations involved, the intentions of their respective boards, and the preferences for risk and return of both the board and the shareholders. Our role is not to pronounce on general matters of corporate strategic planning. It is, however, our duty to point out that the fears expressed by the district court that exclusive merger agreements are anticompetitive and contrary to public policy because they subvert the welfare of shareholders are without merit.
 
 
 35
 We therefore hold that the district court erred in ruling that a merger agreement between boards of directors is of no legal effect prior to shareholder approval. To the contrary, we hold that under California law a corporate board of directors may lawfully bind itself in a merger agreement to forbear from negotiating or accepting competing offers until the shareholders have had an opportunity to consider the initial proposal.[13]
 
 
 36
 III. Interpretation of the Jewel-Pay Less Merger Agreement
 
 
 37
 In reviewing an order granting summary judgment, we are not limited to a consideration of the grounds on which the district court decided the issue. Rather, if the district court's order can be sustained on any ground supported by the record that was before the district court at the time of the ruling, we are obliged to affirm the district court. Calnetics Corp. v. Volkswagen of America Inc., 532 F.2d 674, 682 (9th Cir.) cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); Paskaly v. Seale, 506 F.2d 1209, 1211 n. 4 (9th Cir.1974); Helena Rubinstein, Inc. v. Bau, 433 F.2d 1021, 1023 (9th Cir.1970). The trial court found only that no valid contract existed and that any interference was privileged. Northwest argued vigorously, however, that even if a contract existed it did not by its terms preclude the board from also entering into the Northwest merger agreement. There would be no point in remanding for further proceedings if it were clear as a matter of law that the provisions of the Jewel-Pay Less contract did not preclude the Pay Less board from entering into the Northwest agreement. We therefore analyze the terms of the Jewel-Pay Less merger agreement to determine if the question whether that contract required the Pay Less board to abstain from entering the later agreement with Northwest is one appropriate for disposition on a motion for summary judgment.
 
 
 38
 Appellants strongly urge that certain provisions of the Jewel-Pay Less merger agreement precluded Pay Less' board of directors from entering into the later merger agreement with Northwest's board. The Jewel-Pay Less merger agreement included numerous covenants which would appear to impose immediate, binding contractual obligations on Pay Less, obligations that may be inconsistent with the subsequent signing of a competing merger agreement. Article 9.2 of the agreement stipulated that "[d]uring the period from the date of this Agreement to the Closing, neither the Company nor any Subsidiary shall, without the prior written consent of Jewel ... (iii) sell or transfer any of its properties or assets, or cancel, release or assign any indebtedness to it or any claims held by it, except in the ordinary course of business ... or except pursuant to contracts or agreements in force at the date of this Agreement and disclosed to Jewel ... (v) enter into or terminate any contract or agreement, or make any change in any of its leases or contracts, other than in the ordinary course of business or pursuant to contracts or agreements in force at the date of this Agreement and disclosed to Jewel ..." Section 9.2(viii) of the agreement further provided that Pay Less could not "agree to, or make any commitment to" effect any such sale, transfer, or extraordinary action prohibited in Article 9. The Pay Less board was further required under article 9.9 of this agreement to exert its "best efforts to fulfill those conditions ... over which it has control or influence and to consummate the [M]erger."
 
 
 39
 The question whether the Jewel-Pay Less merger agreement at issue here required that Pay Less' board abstain from entering into a later agreement with Northwest must be resolved by an examination of the intent of the parties. Generally, the intent of the parties can be inferred from the face of the instrument itself. California Civ.Pro.Code Sec. 1856 (West 1983); Molybdenum Corp. of America v. Kasey, 176 Cal.App.2d 357, 363, 1 Cal.Rptr. 400 (1959). However, the Jewel-Pay Less merger agreement is the product of protracted and detailed negotiation, is acknowledged by both parties as intended to be preliminary to a later, more complete, formal contract, and clearly contemplates the occurrence of several conditions precedent to performance. It is a well accepted proposition of contract law that a written contract which is not the complete instrument of expression of the intended rights and obligations of both parties is deemed not to be a total integration for purposes of interpretation. Under California law the parol evidence rule does not bar a court from interpreting such a contract with reference to extrinsic evidence. See Leyse v. Leyse, 251 Cal.App.2d 629, 638, 59 Cal.Rptr. 680 (1967); Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Cavanaugh, 217 Cal.App.2d 492, 506, 32 Cal.Rptr. 144 (1963); Pollyanna Homes, Inc. v. Berney, 56 Cal.2d 676, 679-80, 16 Cal.Rptr. 345, 365 P.2d 401 (1961); see also, California Civ.Pro.Code Sec. 1856 (West Supp.1984). Moreover, under California law, when performance of a contract is contingent upon the occurrence of a condition precedent, the parol evidence rule does not bar the court from admitting extrinsic evidence to assist in its determination as to the intended operation of the contract. Coast Bank v. Holmes, 19 Cal.App.3d 581, 590, 97 Cal.Rptr. 30 (1971); Haines v. Bechdolt, 231 Cal.App.2d 659, 661, 42 Cal.Rptr. 53 (1965); Louis Lesser Enterprises, Ltd. v. Roeder, 209 Cal.App.2d 401, 410, 25 Cal.Rptr. 917 (1962).
 
 
 40
 Where extrinsic evidence is required to interpret a contract, and that evidence is either not available to the district court or has not been fully litigated by the parties, disposition of the contract claim on a motion for summary judgment is inappropriate. See U.S. v. Sacramento Municipal Utility Dist., 652 F.2d 1341, 1344 (9th Cir.1981); 10A C. Wright and A. Miller, Federal Practice and Procedure Sec. 2730.1 (1983). For this reason, courts have held that merger agreements are generally not susceptible to summary disposition.
 
 
 41
 In American Cyanamid Co. v. Elizabeth Arden Sales Corp., 331 F.Supp. 597 (S.D.N.Y.1971) the court considered the question whether it is proper to interpret a merger agreement similar to the Jewel-Pay Less Agreement when considering a motion for judgment on the pleadings under Fed.R.Civ.P. 12(c), or alternatively a motion for summary judgment under Rule 56. Ruling that a determination of whether the parties intended to be bound by the initial merger agreement required an examination of "the history of the negotiations and the contemporaneous utterances of the principal negotiators," the district court in Arden held that the question whether the merger agreement was void was not appropriate for disposition by summary judgment: "These are matters that may not be resolved on a summary judgment motion. We have been admonished that even where the so-called evidentiary facts are not in dispute but the inferences of fact to be drawn from them are disputed the court may not award summary judgment ... [a]nd summary judgment is inappropriate where extrinsic evidence may be admissible." Id. at 606 (citations omitted). See also Mid-Continent Telephone Corp. v. Home Telephone Company, 319 F.Supp. 1176, 1189 (N.D.Miss., 1970) ("Whether contracting parties are bound by an informal [merger] agreement prior to the execution of a contemplated formal writing is a matter of intention to be determined by the surrounding facts and circumstances of each particular case."); Pennzoil Co. v. Getty Oil Co., No. 7425 slip. op. at 24-25 (Del.Ch. Feb. 6, 1984) ("such a determination must be premised on the totality of all such expressions and deeds given the attendant circumstances and objectives that the parties are attempting to attain").
 
 
 42
 Disposition of plaintiff's claims on a motion for summary judgment is inappropriate here. While we have held that under California law the Pay Less board may lawfully commit itself to submit the Jewel proposal to its shareholders on an exclusive basis, the record on appeal does not make it clear whether such an exclusive arrangement was intended by the parties to the transaction at issue. In particular, the record does not demonstrate conclusively whether the parties intended that the Jewel-Pay Less agreement would obligate the Pay Less board to abstain from negotiating or executing a competing merger agreement with the board of another firm.
 
 
 43
 While the specific provisions of the Jewel-Pay Less contract, if taken literally, would appear to preclude the board's entering into a competing arrangement, their effect here is not entirely clear.[14] The history of the particular negotiations and the custom and practice in the field of corporate acquisitions may well determine in large part the purpose and effect of these provisions. The question of the intent of the parties may ultimately be resolved by "inferences of fact to be drawn from [evidentiary facts that are not in dispute]." American Cyanamid Co. v. Elizabeth Arden Sales Corp., 331 F.Supp. at 606.
 
 
 44
 We are persuaded by the briefs and arguments of both parties that the preliminary question of the intent of the parties and the ultimate question of the meaning of the contract can best be resolved by the district court on remand following a trial on the merits. That way the district court will have the opportunity to examine thoroughly the documents generated during the Jewel-Pay Less negotiations, evaluate the testimony of the parties to those negotiations, and consider evidence relating to customary corporate practice in such takeover battles.
 
 
 45
 We therefore hold that because material issues of fact await resolution the district court erred in disposing of this issue on a motion for summary judgment. Smith v. United States, 362 F.2d 366, 368 (9th Cir.1966); Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 785-6 (3d Cir.1976). See generally 10 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2716 (1982).
 
 IV. Justifiable Interference With Contract
 
 46
 The district court made a further ruling that even if the Jewel-Pay Less agreement were binding and valid, Northwest's interference with that agreement would have been justified. The district court cites no legal authorities that support this claim in any way.[15]
 
 
 47
 It is not clear exactly what the district court intended by its pronouncement that interference with a merger contract is justified as a matter of law because "the marketplace is the proper forum to resolve competing tender offers." One possibility is that the district court is simply reiterating its belief that there is no protected interest in a merger agreement prior to shareholder approval.[16] If so, we have already considered this argument, and need not elaborate further on our holding that under California law, a board of directors may enter into an exclusive merger agreement with the board of another corporation and may, therefore, agree to forbear from entering into competing merger contracts pending shareholder approval.
 
 
 48
 Alternatively, the ruling might be understood to mean that in the view of the district judge, society's interest in promoting competition justifies, as a matter of law, a competitor's interference with an otherwise valid merger agreement. We find no support in California law for such a view. To the contrary, the district court's assertion that the policy of promoting free and competitive markets can legally justify interference with an otherwise valid contract has been specifically rejected by the California Supreme Court:
 
 
 49
 It is well established, however, that a person is not justified in inducing a breach of contract simply because he is in competition with one of the parties to the contract and seeks to further his own economic advantage at the expense of the other. Whatever interest society has in encouraging free and open competition by means not in themselves unlawful, contractual stability is generally accepted as of greater importance than competitive freedom. Competitive freedom, however, is of sufficient importance to justify one competitor in inducing a third party to forsake another competitor if no contractual relationship exists between the latter two.
 
 
 50
 Imperial Ice Co. v. Rossier, 18 Cal.2d 33, 36, 112 P.2d 631 (1941) (citations omitted); accord, Olivet v. Frischling, 104 Cal.App.3d 831, 841, 164 Cal.Rptr. 87 (1980); Winn v. McCulloch Corp., 60 Cal.App.3d 663, 673, 131 Cal.Rptr. 597 (1976); Herron v. State Farm Mutual Ins. Co., 56 Cal.2d 202, 207, 14 Cal.Rptr. 294, 363 P.2d 310 (1961); Restatement (Second) of Torts Sec. 768(2) (1979).
 
 
 51
 We also note that the district court's policy premise, that the sole aim of corporate law in these matters is to promote active competition among corporate conglomerates interested in acquiring new targets is a highly controversial point of view and by no means represents the consensus of courts and commentators that have considered the question.[17] No authority has previously suggested that the market for corporate acquisitions is unbounded by traditional principles of contract and corporate law. It is not the function of the courts to fashion so novel a rule or to resolve the policy disputes that have divided the economic experts. That task, if it is to be performed at all, is best left to the California legislature.
 
 
 52
 We hold that the district court's ruling that society's interests in promoting "healthy competition" among those seeking to take over existing companies justifies interference with an otherwise valid merger agreement between the boards of directors of two corporations squarely conflicts with the law of California.
 
 V. Conclusion
 
 53
 It is nowhere written in stone that the law of the jungle must be the exclusive doctrine governing sorties into the world of corporate mergers. The legitimate exercise of the right to contract by responsible boards of directors can help bring some degree of much needed order to these transactions. We reverse the district court's grant of summary judgment for the appellees and remand for further proceedings. Following a trial at which the parties have been afforded a full opportunity to present all the relevant evidence necessary to a proper interpretation of the contract, including evidence regarding custom and practice in the field of corporate acquisitions, it will be possible to determine whether the Jewel-Pay Less merger agreement required the Pay Less board to abstain from entering into the competing merger agreement with Northwest. If it is determined that the Jewel-Pay Less merger agreement did impose an obligation on Pay Less to forbear from entering competing agreements, it will be necessary to determine whether, under the law of California, the actions of defendant Northwest constituted tortious interference with that contract. However, if Northwest continues to assert a defense of justification, it will not be permitted to rely on any purported right of "free competition."
 
 
 54
 REVERSED AND REMANDED.
 
 
 
 *
 Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 Although they bear similar corporate names because of a common corporate ancestor, Pay Less and Northwest were entirely unrelated companies prior to the events at issue here
 
 
 [2]
 At this time Jewel also agreed to purchase the 297,010 shares of Pay Less stock that were held by a foundation that the founder of Pay Less had established. Jewel also entered into a written agreement for an option to purchase an additional 421,486 shares. The option agreement provided that Mrs. Mary C. Skaggs, the widow of Pay Less's founder and the owner of the 421,486 shares, would vote her shares in favor of the Jewel merger, but if the merger were terminated or cancelled, Jewel would nevertheless have the option to purchase her shares for the same .652 exchange ratio offered to other Pay Less shareholders
 
 
 [3]
 Jewel does not specifically press its claim for interference with prospective commercial advantage on this appeal. We think it unlikely that such a cause of action would prove viable in the event we concluded that no binding contract between Jewel and Pay Less existed. In any event, our disposition of the tortious interference with contract claim makes consideration of this issue unnecessary
 
 
 [4]
 On appeal Jewel seeks only an order reversing and remanding the part of the order granting summary judgment to Pay Less and does not contend that it is entitled to a reversal of the part of the order refusing to grant summary judgment in its favor. In any event, for the reasons given hereafter, Jewel would not be entitled to a reversal of the district court's denial of its request for summary judgment
 
 
 [5]
 Courts have held invalid attempts to curtail the board's traditional management function by contract. See e.g. Smith v. Calif. Thorn Cordage 129 Cal.App. 93, 98, 18 P.2d 393 (1933) (contract which places total control of firm finances with finance committee composed of creditors and shareholders held void); Abercrombie v. Davies, 35 Del.Ch. 599, 123 A.2d 893 (1956), rev'd on other grounds, 36 Del.Ch. 371, 130 A.2d 338 (1957) (shareholders' contract which removed power from board of directors to manage firm held invalid); Cf. Cal.Corp.Code Sec. 1602 (absolute right of director to inspect records and physical property of corporation and its subsidiaries)
 
 
 [6]
 That section provides that
 The board of each corporation which desires to merge shall approve an agreement of merger. The agreement shall state: (a) The terms and conditions of the merger; (b) The amendments, subject to Sections 900 and 907, to the articles of the surviving corporation to be effected by the merger; ... (d) The manner of converting the shares of each of the constituent corporations into shares or other securities of the surviving corporation; ... (e) Such other details or provisions as are desired, if any ...
 Cal.Corp.Code Sec. 1101 (West 1977).
 
 
 [7]
 The 1976 revisions to the California Corporate Code attempt to treat all methods of corporate fusion identically. There are three chapters of the Code which deal with the various methods of merger. Chapter 10 deals with sale of assets transactions whereby the consideration received does not subject the recipient to the risk of long-term investment in the acquiring corporation. Chapter 11 deals with traditional statutory mergers, the so-called "merger reorganization." This category also includes short-form merger. Chapter 12 was added in 1976 to extend regulation to so-called de-facto mergers. There was general concern that many of these transactions were motivated by a desire to circumvent shareholders' voting and appraisal rights. Chapter 12 applies to all reorganizations: sale of assets, exchange reorganizations, "triangular" and "up-side-down mergers." M. Small, Corporate Combinations under the New California General Corporate Law, 23 UCLA L.Rev. 1190 (1976)
 
 
 [8]
 Chapter 10 of the California Corporate Code, which is the basic California statute regulating the disposition of a firm's assets, similarly provides that the sale may be approved by the board before or after it is approved by the shareholders. Cal.Corp.Code Sec. 1001 requires that the board of the corporation approve all of the principal terms of the transaction prior to closing. But that section states that where shareholder approval is required, it may be obtained "either before or after approval by the board and before or after the transaction." Cal.Corp.Code Sec. 1001(a)(2)
 
 
 [9]
 Cal.Corp.Code Sec. 1105 provides that "[t]he board may, in its discretion, abandon a merger, subject to the contractual rights, if any, of third parties, including other constituent corporations, without further approval by the outstanding shares ... at any time before the merger is effective." Cal.Corp.Code Sec. 1201(f) states that "[a]ny [shareholder] approval required by this section may be given before or after the approval by the board. Notwithstanding approval required by this section, the board may abandon the proposed reorganization without further action by the shareholders, subject to the contractual rights, if any, of third parties."
 
 
 [10]
 The Code's abandonment provision further supports the legality of an exclusive merger agreement between two boards because it recognizes that the acquiring party possesses significant legal rights prior to the time the agreement becomes final. The Code does not expressly state whether the term "third parties" is intended to refer to the other party to a merger agreement. However, leading authorities on California Corporate law have interpreted the section as referring particularly to the acquiring party. See 1A Ballantine & Sterling, California Corporate Law Sec. 257.02 ("... the board of directors of the selling corporation may abandon the proposed transaction without further action by the shareholders, subject to the contractual rights, if any, of third parties. Such third parties would, of course, most importantly be the purchaser whose rights would be governed by the agreement of sale ..."); See also California Corporate Code Sec. 1201(f)
 The form for a merger agreement included in Deering's California Code Annotated also supports the legality of exclusive merger agreements. The merger agreement form includes an optional covenant stating that "the merger agreement may be abandoned at any time prior to the effective date upon the unanimous agreement of the board." Cal.Corp.Code Sec. 1101 (Deering's 1977). That this covenant was included in the form suggests that merger agreements may be binding and exclusive absent explicit language indicating that the parties intend otherwise.
 
 
 [11]
 It is not necessary for us to delineate the full scope of a board's "best efforts" obligation. See note 13 infra. The term does, however, include at a minimum a duty to act in good faith toward the party to whom it owes a "best efforts" obligation
 
 
 [12]
 The board can bind the corporation temporarily with provisions like those included in the Jewel-Pay Less agreement, which essentially require the board of the target firm to refrain from entering any contract outside the ordinary course of business or from altering the corporation's capital structure. Such provisions are intended, essentially, to preserve the status quo until the shareholders consider the offer
 
 
 [13]
 We do not decide the question whether upon the unsolicited receipt of a more favorable offer after signing a merger agreement the board still must recommend to its shareholders that they approve the initial proposal
 
 
 [14]
 As noted at pp. 1564-1565 supra, those provisions are contained in article 9 of the agreement. We should also point out that while the Jewel-Pay Less agreement does not set forth an exclusivity provision in so many words, it is equally true that if the parties had desired to execute an agreement that was not exclusive and did not require them to abstain from entering into competing contracts, they could have included an express provision to that effect. See e.g. Deering's California Code Annotated Sec. 1101; Freund & Easton, The Three Piece Suitor: An Alternative Approach to Negotiated Corporate Acquisitions, 34 Bus.Law. 1679, 1689 (1979) ("a cautious target may want to provide specifically in the merger agreement that its board is free to accept--if not solicit--a better offer")
 
 
 [15]
 The district court only cites the case of Remillard Brick Co. v. Remillard-Dandini Co., 109 Cal.App.2d 405, 419, 241 P.2d 66 (1952) which sets forth the general responsibilities of a corporate fiduciary and California Corp.Code Sec. 309(a) which is the statute governing the same. Neither authority suggests that a corporate fiduciary's duties justify abrogation of valid contractual agreements with third parties
 
 
 [16]
 Appellees rely on the case of American Cyanamid Co. v. Elizabeth Arden Sales Corp., 331 F.Supp. 597 (S.D.N.Y.1971) for the proposition that "there could be no inducement to breach a prior acquisition agreement known to contain a provision that consummation of the acquisition was subject of approval of the board of directors." Appellee's reliance on Elizabeth Arden is misplaced. While the district court in Elizabeth Arden did grant summary judgment for Lilly on the claims of inducing the sellers to breach, it did so on the basis of facts peculiar to that case. There the plaintiff conceded that Lilly, the ultimate buyer of Arden, and the defendant in the suit against Cyanamid's claims of tortious interference, "did not ask about, nor was it informed of, the facts and circumstances of prior extensive negotiations between plaintiff and the selling defendants ...." 331 F.Supp. at 607. Therefore consistent with its ruling that the purchase agreement must be interpreted with reference to the facts and circumstances surrounding it, the district court granted summary judgment for Lilly on the grounds that plaintiff could not prove an essential element of the tort of interference, that Lilly knew of the existence of the contract stating only that:
 Without knowledge of the circumstances of the background of the negotiations between the plaintiff and the selling defendants, and without knowing that Cyanamid would assert it to be an irrevocable option, the October 2 letter on its face would not appear to be binding. A reasonably prudent person would not, in the circumstances, have assumed, as a matter of law, that there was a binding agreement.
 
 
 [331]
 F.Supp. at 608
 
 
 [17]
 Compare Mobil Corp. v. Marathon Oil Co., 669 F.2d 366, 376 (6th Cir.1981) ("The purpose of the Williams Act, protection of the target shareholders, requires that Mobil and any other interested bidder be permitted an equal opportunity to compete in the marketplace ....") with Buffalo Forge Co. v. Ogden Corp., 717 F.2d 757, 760 (2d Cir.1983), cert. denied --- U.S. ----, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983) ("Marathon was an unwarranted extension of the Williams Act .... Tender Offerers were not the intended beneficiaries of the bill."). Legal scholars disagree sharply on whether aggressive bidding wars for companies lead to better management and efficient production or simply waste legal resources. Compare Bebchuck, The Case for Facilitating Competing Tender Offers: A Reply and Extension, 35 Stan.L.Rev. 23 (1984); Gilson, Seeking Competitive Bids Versus Pure Passivity in Tender Offer Defense, 35 Stan.L.Rev. 51 (1982); Gilson, A Structural Approach to Corporations: The Case Against Defensive Tactics in Tender Offers, 33 Stan.L.Rev. 819, 843-8 (1981) with Grossman & Hart, Disclosure Laws and Takeover Bids, 35 J.Fin. (1980) (intense competition in takeovers may deter firms from investing in research and development because firms fear that competitors will "free ride" on their research by making a competing bid); Easterbrook and Fishel, Auctions & Sunk Costs in Tender Offers, 35 Stan.L.Rev. 1 (1982) (criticizing rule which encourages intense competition in market for corporate control)