DANKRAG, LTD., Plaintiff,

v.

**INTERNATIONAL TERMINAL OPERATING CO., INC.,** Defendant.

**No. 88 Civ. 2164 (RPP).**

United States District Court, S.D. New York.

Jan. 29, 1990.

As Amended Feb. 9, 1990.

Healy & Baillie, by Richard V. Singleton, II, New York City, for plaintiff.

Nourse & Bowles, by John E. Bradley and Shaun F. Carroll, New York City, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

ROBERT P. PATTERSON, Jr.,
District Judge.

Plaintiff Dankrag, Ltd. ("Dankrag"), a Danish corporation which operates a liner service carrying lumber and wood products from Brazil to the United States and the United Kingdom, brings this suit for breach of contract against International Terminal Operating Co., Inc. ("ITO"), a stevedoring company located in New Jersey which formerly conducted operations in the port of Albany, New York. Plaintiff invokes this Court's admiralty and maritime jurisdiction. 28 U.S.C. § 1333.

## I. FACTS

The suit involves a 1987 shipment of bundles of Brazilian "sawn" or "rough cut" lumber of different lengths that Dankrag booked for ocean carriage from various ports in Brazil to Toronto, Canada. Dankrag's general agents, Krag Ship Management APS ("Krag Ship") determined that due to possible freezing of the St. Lawrence Seaway the cargo should be off-loaded at a Northeastern port and trucked to Toronto. Accordingly, in November 1987, Thomas Slomer of Krag Ship obtained quotes for stevedoring costs and trucking rates from various northeastern ports. Among the quotes from stevedores Slomer received was one from ITO's port manager in the port of Albany, Wallace Turnwall, on November 6, 1987. Slomer informed Turnwall that the vessel carrying the cargo would be the REGENT; that the REGENT was a three-hold vessel with four twenty ton cranes; that the Brazilian lumber would be in bundles of approximately one ton each varying in length from 6 to 14 feet; and that the cargo overall would measure 2000 to 3000 cubic meters and weigh approximately 1600 metric tons.

On November 10, 1987 Turnwall notified Slomer by telex that ITO's discharge price would be $10.95 per long ton, plus charges for truck loading, dockage, wharfage, and storage. Slomer also received bids for the trucking of the cargo from Albany to Toronto, and arranged to pay $500 per ton.

Subsequently, Dankrag decided not to charter the REGENT and instead, on November 20, 1987, time chartered the CARIB EVE for the shipment of the Brazilian lumber. In early December, Dankrag's agent in Albany, James Curran, notified Turnwall that the Brazilian lumber was on its way and would be arriving on the CARIB EVE, not the REGENT. Turnwall then consulted Lloyds Register of Ships and other sources, and found that the CARIB EVE differed from the REGENT in that it had two eight ton swinging derricks, it was a converted research vessel, and it did not have box type cargo holds.

On December 10, 1987, Turnwall advised Slomer by telex that, due to these differences between the CARIB EVE and the REGENT, ITO's discharge price would be $15.75 per long ton, not $10.95. After attempting to persuade ITO to hold to its original offer,[1] Dankrag agreed to pay for the hire of a shore crane and accepted ITO's price on December 15, 1987. Dankrag also asked ITO to accept payment terms of fifty percent of the estimated charges prior to starting work and fifty percent prior to completion. By telex dated December 16, 1987, ITO agreed to extend credit in accordance with Dankrag's proposal, and at the same time estimated its cost of discharge to be $25,200, and its total charge to be $32,608.

The CARIB EVE, carrying 1,759 bundles of sawn lumber weighing 1,504,625 metric tons, left Brazil on December 4, 1987. *En route* to Albany, the CARIB EVE made two unscheduled calls at Bermuda. The first call was due to cargo shifting and low fuel after running into heavy weather. Fifty bundles of lumber were discharged

---

**1.** Slomer advised Turnwall at that point that, in fact, the Carib Eve had two five ton cranes, rather than two eight ton derricks.

and restowed. During the second call, after more heavy weather resulted in shifting of the cargo as well as the loss of 75 to 100 bundles of cargo, the entire deck cargo, amounting to one third of the entire cargo, was discharged and restowed during the period December 29, 1987 to January 18, 1988.

The reloading and lashing of the vessel's cargo was supervised by the vessel's master in consultation with ship surveyors retained on behalf of Dankrag and the vessel's owner. One of the surveyors was Captain Kaare Hansen, who had extensive experience in surveying ships and cargo. Captain Hansen was present throughout the restow, and he testified that, with the following exceptions designed to prevent cargo shifting, the cargo was restowed in the same manner as it had been stowed in Brazil. The alterations in the stow were made so as. Outside bundles were deliberately dovetailed. Part of the cargo was used as scantling or dunnage between tiers to bind them together. Custom-made bundles were created to block off the void spaces between the ship's rail and its hatch coamings. Lastly, the cargo was lashed by wire cables running horizontally athwartships. Captain Hansen testified the stowage was tight, but not too tight, and that the restow had not made the lumber's discharge significantly more difficult. During this second stop in Bermuda, the discharge of deck cargo took 42.75 gang hours; restowage took 82 gang hours.

On January 20, 1988, Turnwall was informed by Curran the CARIB EVE would arrive on Friday, January 22, 1988. Before the vessel arrived on January 22, 1988, Curran confirmed to ITO he had received the deposit of fifty percent of the estimated charges for ITO's account, and Turnwall ordered labor to work the ship the next day. The CARIB EVE arrived that night.

On Saturday, January 23, 1988 at 8:00 a.m., ITO began work on the vessel. There was snow covering the cargo and Turnwall discovered none of the ship's cranes, including the two eight ton main hatch cranes were in working order. The snow was removed from the cargo; a forward hatch crane of two-ton capacity was fixed; and at 9:45 a.m., ITO's shore crane was brought along side and began discharging the vessel.

Around 10:30 a.m., Turnwall learned that Anger Kirkman–Moeller, the operations manager for Krag Ship, was present and informed him that ITO would not be able to discharge the vessel at the rate it had quoted, but would charge on a gang hour basis. Turnwall gave as his reasons the condition of the stowage and the inoperable main hatch cranes. Moeller responded that Dankrag and ITO "had a contract" and that ITO's change in rate "would have to be discussed." Moeller asked how much it would cost, and Turnwall estimated $1,000 per gang hour. Turnwall invited Moeller to his office for a final estimate, but Moeller did not go. Turnwall then calculated a charge of $931.23 per gang hour, and gave it to Curran along with an estimate of charges for the following Monday. Turnwall did not discuss the new charges with Moeller. In fact, the evidence does not show he had any further discussions with Moeller.

Curran ordered labor on Monday, January 25, 1988, and ITO worked the ship. Also on Monday, Turnwall gave Curran an invoice for the work done on Saturday, and an estimate of Tuesday's charge. On Tuesday, January 26, 1988, Curran again ordered labor, ITO worked the ship and Curran received from Turnwall an estimate for Wednesday's work and an invoice for the work done on Monday. On Wednesday, January 27, 1988, Curran again ordered labor, ITO worked the ship and Curran received from Turnwall an estimate for Thursday's work and an invoice for Tuesday's work.

On Wednesday, Moeller determined to cease using ITO and to discharge the remaining half of the cargo in Portland, Maine. Turnwall, however, would not allow the CARIB EVE to leave Albany unless all of the outstanding charges were paid. On that day, Curran effected a wire transfer to ITO of $34,727.84 as partial payment of ITO's invoices. The wire transfer remittal form stated that the payment

was made "with reservations." On Thursday, January 28, 1988, before the CARIB EVE left port, Curran delivered a certified check to Turnwall in the amount of $33,-399.36 for the balance of ITO's charges. The check stated that payment was also made "with reservations."

The CARIB EVE arrived in Portland on January 30, 1988, after refueling off Stapleton Anchorage, New York Harbor. On January 31, 1988, the remaining 802 bundles were discharged from the vessel in 13 hours, at a cost for stevedore labor of $10,765.15. The CARIB EVE then returned to Ambrose, New York, where it was delivered to the owner as required by the charter agreement, but several days late under its time charter.

## II. DISCUSSION

The parties' positions can be stated simply. Plaintiff argues that ITO was contractually bound to discharge the cargo for $15.75 per long ton, that ITO unjustifiably breached this contract, and that plaintiff took all reasonable steps to mitigate its damages. Defendant argues that no binding contract arose and that, even if one did arise, the condition of the ship and the manner in which the cargo was stowed prevented ITO from performing as contemplated by the parties. Defendant claims that the contract should be voided on the grounds of mutual or unilateral mistake, or material change from implied in fact conditions. Defendant also asserts that, in the event Dankrag is found to be entitled to recover, its damages should be reduced to the extent that it failed to mitigate. Finally, the parties dispute the proper computation of damages.

### 1. *The Existence of a Contract*

■ Plaintiff asserts that the telex exchange between the parties in mid-December 1987 represented an offer and acceptance of a price for discharge of $15.75 per long ton, payable one-half before discharge commenced, and one-half when discharge ended. Defendant argues that no contract binding it to perform for $15.75 per long ton ever arose.

The Court finds that the telexes between the parties, culminating with the December 16 telex in which ITO accepted Dankrag's proposed payment terms and restated the agreed price, set forth the agreed terms of a contract between the parties. Dankrag became obligated to pay ITO $15.75 per long ton if Dankrag presented the CARIB EVE in Albany and paid fifty per cent of the estimated charges to ITO before discharges began, and ITO became obligated to discharge the lumber at that price, subject to the two conditions precedent.

■ The Court further finds that Dankrag satisfied the conditions precedent to ITO's performance by presenting the CARIB EVE in Albany on January 22, 1988 and arranging the deposit of fifty per cent of the estimated discharge costs in its agent's account the day before discharge began.[2] ITO therefore became obligated to discharge the lumber aboard the CARIB EVE at a rate of $15.75 per long ton.[3]

### 2. *Dankrag's Performance*

Defendant claims that it was excused from performance because of the condition of the cranes on board the ship and the manner in which the cargo was restowed. Defendant argues the parties made a mutual mistake as to these matters, making the contract voidable by ITO, the adversely affected party. Alternatively, defendant argues that the condition of the cranes and the restow technique violated implied in fact conditions of the contract, or else made ITO's performance commercially impracticable.

**2.** The Court finds ITO waived deposit in its own account and accepted deposit in the shipping agent's account.

**3.** The doctrine of promissory estoppel also provides authority for the Court's conclusion that ITO was bound to perform at the offered rate of $15.75 per long ton, since the CARIB EVE had proceeded up river to Albany in reliance, at least in part, on ITO's offer. *Restatement (Second) of Contracts*, §§ 87, 90; *Esquire Radio and Electronics v. Montgomery Ward*, 804 F.2d 787, 793 (2d Cir.1986); *E.A.S.T., Inc. of Stamford v. M/V Alia*, 673 F.Supp. 796 (E.D.La.1987), *aff'd*, 876 F.2d 1168 (5th Cir.1989).

■ The evidence shows the problems created by the inoperability of the vessel's main cranes could have been, and to some extent were, rectified by hiring shore cranes at a comparatively slight extra charge. The Court finds that the contract between the parties permitted Turnwall to hire, for Dankrag's account, another crane to cure the problem of the inoperability of both main hatch cranes. In view of these facts the Court does not feel that the condition of the cranes was of such importance to the contract that the parties' mutual mistake as to their operability voided ITO's duty to perform, or that their inoperability constituted a material change in the implied conditions of the contract such that ITO was excused from performing.

■ The real difficulties that arose were the result of Turnwall's lack of knowledge as to how Brazilian lumber is customarily stowed. He was unfamiliar with Brazilian lumber shipments and their manner of discharge, and failed to research the cost and technique of discharging this type of cargo before offering a discharge price of $15.75 per long ton. The Court does not find mutual mistakes as defendant ITO argues, but a unilateral mistake. Based on the photographs of the cargo as it was stowed in Brazil, the testimony of Captain Hansen, the ship's surveyor, the photographs taken in Albany, and Captain Bennett's testimony about the estimated rate of discharge of such cargo, the Court finds that the rate at which ITO could discharge the cargo was not materially affected by the differences between the restow and the original stow. ITO's slow productivity was not the result of the manner in which the cargo was stowed on the CARIB EVE but rather Turnwall's inexperience with this type of cargo. Turnwall had unfortunately estimated an average rate of discharge of 6 bundles of lumber at a time for a rate of production of 60 bundles per gang hour. He based this estimated rate of discharge on experience with West Coast finished lumber, which is shipped in bundles of uniform length. He had never handled a shipment of rough cut lumber before. He did not confirm the feasibility of his estimates with stevedores in North and South Carolina, where rough cut Brazilian lumber is imported in quantities. Thus, Turnwall took a risk when offering a discharge rate of $15.75 per long ton for this cargo.[4] Having agreed to this rate, ITO is bound by it. *Jarka Corp. v. Hellenic Lines, Ltd.*, 182 F.2d 916 (2d Cir. 1950) ("it is not the function of courts to protect businessmen from their losing gambles or to deny to an apt, or more probably, fortunate negotiator the fruit of his success.").

### 3. *Damages*

ITO does not argue that the parties modified the contract to require Dankrag to pay on a gang hour basis, so the Court need not decide that issue. Instead, ITO argues that Dankrag failed to mitigate its damages when it allowed ITO to continue working the ship even after Turnwall had expressed to Moeller his intention to charge on a gang hour basis and began submitting invoices and estimated charges reflecting that change.

■ There is no dispute that the breach of contract, if any, occurred on the morning of January 23, 1988, when Turnwall informed Moeller that ITO could not continue to discharge the lumber at $15.75 per ton. At that point, Dankrag became obligated to mitigate its damages by taking reasonable steps to avoid their unnecessary accumulation. *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489 (2d Cir.1985). Its choices were to rescind the contract and make other arrangements for discharging the vessel, or allow ITO to continue its discharge efforts and claim damages for breach. *Clark–Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987). Plaintiff did not rescind the contract at that time because ITO was the only stevedore in

---

**4.** Although Slomer permitted Turnwall to assume falsely that ITO would be able to discharge six bundles at a time, there is insufficient evidence to hold that Turnwall relied on Slomer's representations in making his bid or that Turnwall's bid was somehow conditioned on Slomer's advice as to the possible rate of discharge.

Albany; it was unaware what other stevedores in other ports would charge; and it was not sure whether the charge on a gang hour basis would turn out to be similar to ITO's original $15.75 per ton rate. In short, it was reasonable for plaintiff to believe that rescinding the contract might increase its damages rather than mitigate them. To the extent that Turnwall believed that Dankrag had agreed to pay on a gang hour basis, and was therefore misled into continuing to perform when he otherwise would not have, it was because of his own misapprehension of the situation. By Monday evening, January 25, it was clear to plaintiff that the charge was going to be too high and it took steps to extend its charter agreement with the owner and to discharge at another port in order to mitigate its damages. In light of the testimony presented, Dankrag took steps to mitigate its damages as promptly as possible once it became clear that ITO was incapable of unloading the CARIB EVE at a cost anywhere near the contract price. Accordingly, ITO is not entitled to any offset for Dankrag's failure to mitigate damages.

█ The Court calculates plaintiff's damages as follows. Pursuant to the terms of the contract, Dankrag was obligated to pay $32,608.00, plus $2,400 for a shore crane supplied by defendant, and $7,443.84 for standing time that would have accumulated had ITO charged on the per ton basis, or a total of $42,457.84. Dankrag paid ITO $68,127.20, and therefore overpaid by $25,676.36.

Dankrag is also entitled to the cost of moving the CARIB EVE to Portland, the discharge costs in Portland, the differential in trucking costs caused by the move, and the additional time-charter costs incurred. The proper charge for the trip to Portland would be the charter hire charge from Ambrose Light to Portland, or $3,839.88, as defendant contends, since the CARIB EVE had to be returned to Ambrose under its charter terms in any event. The stevedoring and port costs in Portland of $16,643.97 as claimed by plaintiff are found to be correct, as are the additional trucking costs of $4,235.00. The Court does not apply any

discount to the trucking charges as it does not know the reasons for Midwest Trucking's lesser charge. Moeller testified that the dollar amount Dankrag had to agree to pay the CARIB EVE's owner for the late ship delivery was $4,724.35, and the Court accepts this amount as correct.

As there has been no showing of exceptional circumstances, plaintiff is also awarded pre-judgment interest from January 28, 1987. *See Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 310 (2d Cir.1987); *Mitsui & Co. v. American Export Lines*, 636 F.2d 807, 823 (2d Cir.1981).

Accordingly, judgment shall be entered for plaintiff in the amount of $55,119.56.

SO ORDERED.